

Opinions of the United
States Court of Appeals
for the Third Circuit

9-24-1999

# Ngo v. INS

Precedential or Non-Precedential:

Docket 97-1419

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Ngo v. INS" (1999). *1999 Decisions.* Paper 264.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/264

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 24, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1419

CHI THON NGO a/k/a DAVID LAM,
        Appellant

v.

IMMIGRATION AND NATURALIZATION SERVICE

APPEAL FROM THE DENIAL OF WRIT OF HABEAS
CORPUS BY THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 96-cv-7755)
District Judge: Honorable Robert F. Kelly

Argued June 23, 1999

Before: ROTH, WEIS and COWEN, Circuit Judges

(Filed September 24, 1999)

        Steven A. Morley, Esquire (ARGUED)
        Bagia & Morley
        The Bourse, Suite 592
        111 S. Independence Mall East
        Philadelphia, PA 19106

        Attorney for Appellant

        Virginia R. Powel, Esquire
        Office of the United States Attorney
        615 Chestnut Street, Suite 1250
        Philadelphia, PA 19106

David W. Ogden, Esquire
 Acting Assistant Attorney General,
Civil Division
David M. McConnell, Esquire
 Assistant Director
Papu Sandhu, Esquire (ARGUED)
Emily A. Radford, Esquire
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

Attorneys for Appellee

OPINION OF THE COURT

WEIS, Circuit Judge.

The issue in this appeal is whether aliens who have committed serious crimes in this country may be detained in custody for prolonged periods when the country of origin refuses to allow the individual's return. We conclude that such detention is permitted by the relevant statutes, and is constitutional if the government provides individualized periodic review of the alien's eligibility for release on parole. Because petitioner did not receive the necessary rigorous review, we will grant a writ of habeas corpus subject to the right of the Immigration and Naturalization Service to promptly institute appropriate administrative action.

Petitioner is a native of Vietnam who was paroled 1 into

_____

1. The Attorney General has the discretion to temporarily "parole" alien refugees into the United States. 8 U.S.C. S 1182(d)(5)(A), (B) (1994). The term "parole" is nowhere defined. See 5 Charles Gordon et al., Immigration Law and Procedure S 62.01[1], at 62-2 (1999). In the context of an alien's initial entry, this amounts to permission by the Attorney General for ingress into the country but is not a formal "admission." 8 U.S.C. S 1182(d)(5)(A) (1994). When the Attorney General concludes that the purposes of this immigration parole have been served, she may order the alien to "return or be returned to . . . custody." Id. When parole is revoked, the alien reverts to the status of an applicant for admission,

the United States as a refugee in 1982. He was arrested in 1988 for possession of a firearm and in 1989 for attempted robbery. He was convicted in state court and received concurrent sentences of one year each for the firearm offense and an accompanying bail-jumping charge, and two to four years for the attempted robbery.

In March 1995, petitioner was subjected to exclusion proceedings by the INS for lack of a valid immigrant visa, 8 U.S.C. S 1182(a)(7)(A)(i)(I) (1994); conviction of a crime involving moral turpitude, id. S 1182(a)(2)(A)(i)(I); and conviction of two or more crimes for which the aggregate sentences actually imposed were five years or more, id. S 1182(a)(2)(B). After a hearing before an immigration judge, petitioner was ordered excluded and deported. The order became final on July 6, 1995.

After petitioner was paroled by state authorities, he was taken into custody by the INS and has been detained since that time. The record does not disclose exactly when petitioner came into INS custody, but it appears to have been around the middle of 1995. The detention was served in county jails in Pennsylvania until petitioner was transferred to the INS center in New Orleans, Louisiana, where he is presently confined. The INS has attempted to return petitioner to Vietnam, but that country has refused to accept him.

Petitioner sought habeas corpus relief in December 1995, but his request was denied by the District Court, which cited the INS' "diligent effort[s]" to return him to Vietnam. No appeal was taken. Petitioner subsequently filed the present petition in November 1996, contending that because Vietnam will not take him back, he is subject to virtually indefinite detention in violation of due process.

_____

whose admissibility is determined in exclusion or the more recent removal proceedings. 8 U.S.C. S 1226 (1994); id. S 1229a (Supp. II 1996); 5 Gordon et al., supra, S 62.01[4], at 62-12. "Parole" in this sense is different from the conventional sense of parole from a term of incarceration. As will be seen, the term "parole" has a third usage describing the release from custody of aggravated felons who are being held in administrative detention.

Petitioner also contended that he should be eligible for release on parole. His submissions to the District Court included letters from individuals attesting to his reformed character, and a statement that while incarcerated, he had obtained a GED, learned skills, and attended classes on behavior modification and theology. The District Court denied relief to petitioner without an evidentiary hearing.

Petitioner had also applied to the Attorney General for release on parole. An Assistant District Director for Detention and Deportation denied the request in a 1996 letter, stating that petitioner represented a high risk of flight and a threat to the safety of the community based on his record of convictions and bail jumping. Some months later, another Assistant District Director, in an affidavit, echoed the previous letter. Since then, petitioner has been denied discretionary parole in at least three letters that essentially parrot the previous refusals.

On appeal, we appointed counsel for petitioner, who previously had been unrepresented. In this Court, petitioner contends that confining him on an indefinite and possibly permanent basis is a denial of his substantive and procedural due process rights. Moreover, he asserts that denial of parole without a determination of his present dangerousness and risk of flight is arbitrary and capricious, particularly in the absence of detailed regulations governing review of such applications.

The District Court had jurisdiction over the petition for habeas corpus under 28 U.S.C. S 2241. Sandoval v. Reno, 166 F.3d 225, 237–38 (3d Cir. 1999); see also DeSousa v. Reno, ___ F.3d ___, No. 99–1115, 1999 WL 643171, at *5 (3d Cir. Aug. 25, 1999). We have appellate jurisdiction under 28 U.S.C. S 1291, and review the dismissal of an application for habeas corpus de novo. Yang v. Maugans, 68 F.3d 1540, 1546 (3d Cir. 1995).

I.

Petitioner does not contend that the Attorney General lacks authority to remove him from the United States, but instead, disputes whether she may keep him in custody. The first issue before us is whether, after afinal order of

4

exclusion is issued, she has the statutory authority to detain aliens who have committed specific crimes. We conclude that the Attorney General does have such power under both the statute in force at the time of the petitioner's initial detention, and the version as amended in 1996.

At the time petitioner was first detained, the Immigration and Naturalization Act required the Attorney General to "take into custody any alien convicted of an aggravated felony upon release of the alien" from incarceration, pending a determination that he was excludable. 8 U.S.C. S 1226(e)(1) (1994); see also 8 U.S.C.S 1182(d)(5)(A) (1994) (giving the Attorney General the right to return into custody a parolee who had been allowed into the country when, in her opinion, "the purposes of such parole shall .. . have been served"). Under that version of the Act, Congress required that an excluded alien be "immediately deported," unless the Attorney General concluded that, "in an individual case, . . . immediate deportation is not practicable or proper." 8 U.S.C. S 1227(a)(1) (1994).

In cases where the country of origin would refuse or unduly delay the alien's return, the Attorney General could release the detainee from custody, but only where review established that he would not pose a danger to the safety of other persons or property. 8 U.S.C. SS 1226(e)(2), (3), 1253(g) (1994); see also Alvarez–Mendez v. Stock, 941 F.2d 956, 960–62 (9th Cir. 1991) (under section 1226(e), once alien is taken into custody, detention must continue even after a final order of exclusion is issued).

Although the version of the Act applicable when petitioner was first detained does not expressly grant authority to detain excluded aliens, the overall structure of the statute's provisions makes it clear that Congress intended this result. In Barrera–Echavarria v. Rison, 44 F.3d 1441 (9th Cir. 1995) (en banc), the Court of Appeals for the Ninth Circuit examined the interplay of the Immigration Act's various sections and stated that"it seems difficult not to conclude that the statutory scheme implicitly authorizes prolonged detention." Id. at 1446

5

(discussing 8 U.S.C. SS 1182(d)(5)(A), 1227(a)(1) (1994)). Nearly every Court of Appeals to reach the issue has agreed.2

Even though the Immigration Act has never been a model of clarity, we agree with the courts that have construed its language and structure to permit the prolonged detention of excludable aggravated felons. To categorically "requir[e] that excludable aliens be released into American society when neither their countries of origin nor any third country will admit them," id. at 1448, will "ultimately result in our losing control over our borders." Jean v. Nelson, 727 F.2d 957, 975 (11th Cir. 1984) (en banc), aff'd , 472 U.S. 846 (1985); see also Guzman, 130 F.3d at 66 ("Congress intended to grant the Attorney General the authority to detain excludable aliens indefinitely . . . ."); Barrera-Echavarria, 44 F.3d at 1448 (in an area with"sensitive foreign policy implications," the Attorney General has the authority to detain excluded aliens).

In 1996, after petitioner had been placed in detention, Congress made sweeping changes to the Immigration Act. See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA").3 Under the IIRIRA, what was once implicit is now express -- the Immigration Act now specifically provides that the Attorney General shall detain an "inadmissible" alien for a

───────────────────────────────────────────────

2. See Guzman v. Tippy, 130 F.3d 64, 65 (2d Cir. 1997) ("authorization is implicit in the statutory language"); Gisbert v. U.S. Attorney General, 988 F.2d 1437, 1446, amended, 997 F.2d 1122 (5th Cir. 1993) (section 1226(e) "appears to assume" the power to detain); Fernandez-Roque v. Smith, 734 F.2d 576, 582 (11th Cir. 1984) (appearing to assume there was authority to detain); Palma v. Verdeyen, 676 F.2d 100, 103-04 (4th Cir. 1982) (Congress "implicitly authorized" indefinite detention). Cf. Alvarez-Mendez, 941 F.2d at 962 (concluding that the statute explicitly authorizes continued detention). But see Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382, 1385 (10th Cir. 1981) (statute is vague).

3. Immigration law is sufficiently labyrinthian without jumbled cross-references to the sections of the Immigration Act, IIRIRA, AEDPA, and the United States Code. When referring to statutory provisions, we therefore cite only to the United States Code wherever possible.

90-day period pending "removal" from the country,[4] and may continue to detain him until deportation if he has been found guilty of designated crimes. 8 U.S.C. S 1231(a) (Supp. II 1996).

Many provisions of the amended statute, however, do not apply to an alien "who is in exclusion . . . proceedings before [this subtitle's] effective date" of April 1, 1997. 8 U.S.C. S 1101 note (reprinting IIRIRAS 309(c)(1)). It is arguable that since a final order of exclusion had been entered against petitioner before the effective date, he was no longer "in exclusion proceedings," and therefore, that the amended Act does not govern his situation. See Zadvydas v. Underdown, ___ F.3d ___, No. 97-31345, 1999 WL 604311, at *4 & n.7 (5th Cir. Aug. 11, 1999) (noting the confusion in the statute, and concluding that the IIRIRA applies to aliens who have received a final exclusion order). Because both the former and present statutes grant the

_____

4. Among the changes brought by the IIRIRA was a shift in basic immigration terminology. Previously, "excludable" aliens were those who were ineligible for admission or entry into the United States, even though in reality they were often granted "parole," which allowed them to come into the country. 8 U.S.C. S 1182 (1994); Alvarez-Mendez, 941 F.2d at 961 n.4. Excludable aliens could have their "parole" revoked, with exclusion proceedings brought to deport them. 8 U.S.C. SS 1182(d)(5)(A), 1226-1227 (1994). "Deportation" proceedings, in contrast, were brought against those aliens who had gained admission into the country. Id. S 1252 (1994); Alvarez-Mendez, 941 F.2d at 961 n.4. See generally 5 Gordon et al., supra, S 65.02[1].

As amended, the Immigration Act refers to "inadmissible" aliens in the place of "excludable" aliens. Although there are still separate grounds of "inadmissibility" and "deportability," the distinction now turns on whether an alien has been "admitted" to the United States, rather than on whether the alien has gained "entry." 5 Gordon et al., supra, S 63.01[3], at 63-7 & n.17 (citing 8 U.S.C. S 1101(a)(13)); id. S 65.02[2], at 65-7 to 65-11. Also, the former distinction between "exclusion" and "deportation" proceedings has been dropped in favor of one procedure, called "removal" proceedings. 8 U.S.C. S 1229a (Supp. II 1996). Although certain inadmissible aliens are subject to an expedited removal procedure, id. SS 1225(b), 1228, the amended Act now uses "removal" proceedings as the general procedure for both inadmissible and deportable aliens. Id. S 1229a(a)(2), (3).

7

Attorney General authority to detain, we need not and do not decide which version currently applies.

Similarly, both versions provide that the Attorney General may release a criminal alien from detention on parole subject to regulations. 8 U.S.C. S 1231(a)(3), (6) (Supp. II 1996); 8 U.S.C. S 1226(e)(2), (3) (1994). Finally -- as will later appear -- the INS' parole review rules apply in either case.5

II.

Serious conflicts between policy and constitutional concerns are presented by criminal aliens whose countries of origin refuse to repatriate them. Congress' measures to insulate the community from potentially dangerous criminal aliens via lengthy detention have the potential to violate due process. Yet alternatives to incarceration have problems as well -- one Justice Department report concluded that 90 percent of aliens released from custody abscond. See Department of Justice, Immigration and Naturalization Service, Executive Office for Immigration Review, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,323 (1997).

The influx into this country of Cuban criminals from Port Mariel in 1980 presents a concrete example of this conflict. Many of them were hardened convicts who had been released from their Cuban jails and included in the boat-lift. The Cuban government has refused to permit their return. Consequently, many of the Mariel Cubans-- approximately 1,750 -- still remain in INS detention because of their danger to the community. In addition to this group, the governments of Vietnam, Laos and

_____

5. The adoption of the AEDPA and IIRIRA by Congress in 1996, together with the IIRIRA Transitional Rules that expired in October 1998, have created a complex assortment of amended and repealed provisions that is frequently baffling. In such a setting, rambling discussions on the possible application of the various versions of the statutes without a necessity to do so can create troubling precedents or dicta.

8

Cambodia have refused to repatriate citizens who have been ordered to be deported from the United States. The number of such aliens, including a number of Cubans who were not part of the Mariel boat-lift, exceeds 1,800.

The power to exclude aliens is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 210 (1953). "For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." Mathews v. Diaz, 426 U.S. 67, 81 (1976). It is a truism that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." Id. at 79-80. An alien who is "on the threshold of initial entry" stands on a footing different from those who have "passed through our gates" -- " `Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.' " Mezei, 345 U.S. at 212 (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)).

The case before us does not question the validity of the procedures used to admit or exclude petitioner, but it is against that backdrop that we consider whether the indeterminable nature of his detention pending ultimate deportation rises to a constitutional violation. Even an excludable alien is a "person" for purposes of the Fifth Amendment and is thus entitled to substantive due process. Wong Wing v. United States, 163 U.S. 228, 238 (1896) ("persons within the territory of the United States . . . and . . . even aliens . . . [may not] . . . be deprived of life, liberty or property without due process of law"); see also Lynch v. Cannatella, 810 F.2d 1363, 1366 (5th Cir. 1987) (excludable alien may not be subjected to brutality by government officials). In addition, procedural due process is available to aliens in some circumstances. See Landon v. Plasencia, 459 U.S. 21, 32-33 (1982) ("a continuously present resident alien is entitled to a fair hearing when threatened with deportation . . . [and] has a right to due process" before being required to leave the country).

9

In Mezei, the Attorney General detained an excludable individual for more than 21 months at Ellis Island because he posed a security threat. Other nations had refused to take him into their country. The Supreme Court concluded that no constitutional violation had occurred. 345 U.S. at 215-16. Mezei has been much criticized, 6 but has remained a governing precedent and has been applied, with some modifications, in most of the leading cases.

In Barrera-Echavarria v. Rison, a case involving a Mariel Cuban, the Court of Appeals for the Ninth Circuit concluded that "applicable Supreme Court precedent squarely precludes a conclusion that [excludable aliens] have a constitutional right to be free from detention, even for an extended time." 44 F.3d at 1449. However, the Court qualified its holding, recognizing that the case did not involve "the constitutionality of `indefinite' or `permanent' detention with no prospect of release." Id . at 1450. Barrera-Echavarria also pointed to the existence of detailed regulations providing for periodic review of the alien's eligibility for parole. Id. (discussing 8 C.F.R. SS 212.12, 212.13). Thus, the custody was not indefinite, but was instead "a series of one-year periods of detention followed by an opportunity to plead [the] case anew." Id. In those circumstances, the Court concluded that there was no constitutional violation. Id.

Most appellate courts have reached a similar result, with some variation in their reasoning. In Palma v. Verdeyen, the Court of Appeals for the Fourth Circuit refused to hold that the detention of a Mariel Cuban violated due process, saying that "the fifth and sixth amendments do not require a restrictive interpretation of the Immigration Act that would either circumscribe the right of the United States to deny admission to aliens or limit the congressional power granted in Article I S 8 . . . . ." 676 F.2d at 104; see also Guzman, 130 F.3d at 66 (excluded alien's rights determined

_____

6. See, e.g., Jean, 472 U.S. at 876 n.9 (Marshall, J., dissenting) (listing
commentaries); Lisa C. Solbakken, Note, The Anti-Terrorism And Effective
Death Penalty Act: Anti-Immigration Legislation Veiled in an Anti-Terrorism
Pretext, 63 Brook. L. Rev. 1381, 1400 n.100 (1997) (listing commentaries).

10

by procedures established by Congress and not by the due process protections of the Fifth Amendment, and noting existence of regulations allowing parole); Gisbert, 988 F.2d at 1442–44 ("continued INS detention of the petitioners is not punishment and does not constitute a violation of the aliens' rights to substantive due process," and noting the existence of regulations for a grant of parole); Fernandez–Roque, 734 F.2d at 582.

The one appellate opinion fundamentally differing in its approach is Rodriguez–Fernandez v. Wilkinson. There, the Court of Appeals for the Tenth Circuit observed that the prolonged detention at issue was "imprisonment under conditions as severe as we apply to our worst criminals." 654 F.2d at 1385. Acknowledging the "entry fiction" that detention is only a continuation of exclusion, the Court construed the statute to require release so as to avoid the "serious constitutional questions" of indefinite detention. Id. at 1386.

It is significant, however, that the decision in Rodriguez–Fernandez was handed down before the promulgation of regulations providing parole review for Mariel Cubans. A number of Courts have looked to the existence of those procedures to turn back due process challenges. See Guzman, 130 F.3d at 66; Barrera–Echavarria , 44 F.3d at 1450; Palma, 676 F.2d at 104–05. Cf. Alvarez–Mendez, 941 F.2d at 962–63 (not relying on existence of procedures in constitutional analysis); Gisbert, 988 F.2d at 1442–44 (holding that denial of parole is not a constitutional violation, but noting that petitioners did not assert the government failed to follow the review procedures); Fernandez–Roque, 734 F.2d at 582 (because petitioners had no liberty interest whatsoever, there was no need to look to Cuban review procedures).

A post–IIRIRA case also cited the parole provisions. In Zadvydas v. Underdown, the Court of Appeals for the Fifth Circuit discussed the plight of a "stateless person" with a long criminal history who had been ordered deported. In that case, the petitioner was a resident alien rather than an excludable alien, as was the situation with the Mariel Cubans. The Court, looking to the IIRIRA, decided that once an order of deportation is final, no distinction exists

11

between the rights of resident aliens and those ordered removed as excludable. 1999 WL 604311, at *5, *11-*12. In that fashion, the Court confined the distinction created by the Mezei "entry fiction" to proceedings prior to a final order of exclusion or deportation. Id. at *12-*13.

The Zadvydas Court noted two justifications for detention -- the risk of flight and the threat of additional criminal activity. "[W]hile we must tolerate a certain risk of recidivism from our criminal citizens, we need not be similarly generous when it comes to those who have not achieved citizenship." Id. at *13. The Court held that detention was permissible "while good faith efforts to effectuate the alien's deportation continue and reasonable parole and periodic review procedures are in place." Id. at *14. Reasoning that the alien might ultimately find a country that would accept him, the Court concluded that the detention was permissible because rules permitting parole review were in existence. Id. at *4, *7, *14 (citing Gisbert, 988 F.2d at 1443 n.11).

To summarize, case law holds there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

To a large extent, these holdings are based on thefiction that "detention is not punishment," and the"entry" fiction that an excludable alien "stands at the border" even when he has been physically present within the country for years. Characterizing prolonged detention as anything other than punishment might be somewhat puzzling to petitioner, who remained in jail under the same conditions as before the state released him, although his status had technically changed from that of a state inmate to an INS "detainee." Similarly, an alien whose detention occurs in a maximum security federal prison may be forgiven for wondering when his punishment stopped and detention began. Rodriguez-Fernandez, 654 F.2d at 1385.

12

As Justice Jackson remarked, "[i]t overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound." Mezei, 345 U.S. at 220 (Jackson, J., dissenting). It is similarly unrealistic to believe that these INS detainees are not actually being"punished" in some sense for their past conduct.

Nevertheless, the power of the government to detain aliens is well-established. Reno v. Flores, 507 U.S. 292, 305-06 (1993). Even citizens may be confined pretrial under certain circumstances. United States v. Salerno, 481 U.S. 739, 746-48 (1987). Indeed, a citizen may be committed indefinitely when his mental condition poses a danger of criminal violence to the community. Kansas v. Hendricks, 521 U.S. 346, 363 (1997); Addington v. Texas, 441 U.S. 418, 426-27 (1979).

We therefore hold that aliens with criminal records as specified in the Immigration Act may be detained for lengthy periods when removal is beyond the control of the INS, provided that appropriate provisions for parole are available. When detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable. The fact that some aliens posed a risk of flight in the past does not mean they will forever fall into that category. Similarly, presenting danger to the community at one point by committing crime does not place them forever beyond redemption.

Measures must be taken to assess the risk of flight and danger to the community on a current basis. The stakes are high and we emphasize that grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for aliens.

For example, the petitioner in this case was repeatedly denied parole by INS officials based on no more than a reading of his file that listed years-old convictions for firearm, attempted robbery, and bail jumping offenses. No inquiry was made to ascertain, for example, whether the bail jumping offense was the result of a lack of notice, misunderstanding, or an affirmative effort to avoid apprehension. The INS made no effort to determine if such

13

conduct was presently likely to be repeated or whether it could be discouraged by requiring appropriate surety. Through at least four denials of parole, the INS continued to cite to the petitioner's now nearly ten-year old convictions as justification to confine him.

We do not suggest that these convictions are no longer relevant. Due process is not satisfied, however, by rubber-stamp denials based on temporally distant offenses. The process due even to deportable and excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk offlight.

It is extremely unlikely that the petitioner's detention will be permanent. Diplomatic efforts with Vietnam are underway, albeit at a speed approximating the flow of cold molasses. Although the progress is agonizingly slow, it nonetheless represents movement toward the petitioner's ultimate repatriation. He has, however, been detained in a prison setting for more than four years after being found by state authorities to be suitable for release into the community following his criminal convictions. To presume dangerousness to the community and risk of flight based solely on his past record does not satisfy due process.

After oral argument on this case, the INS announced detailed Interim Rules for detainees such as petitioner, and its intention to promulgate regulations to the same effect.[7] These rules have some similarities to those available for the Mariel Cubans. The Interim Rules include (1) written notice to the alien thirty days prior to the custody review advising that he may present information supporting a release; (2) the right to representation by counsel or other individuals; (3) the opportunity for an annual personal interview; (4) written explanations for a custody decision; (5) the opportunity for review by INS headquarters; (6) reviews every six months; (7) a refusal to presume continued detention based on criminal history; and other provisions, as quoted in the Appendix attached to this opinion.

_____

7. United States Department of Justice, Immigration and Naturalization Service, Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Interim Changes and Instructions for Conduct of Post-Order Custody Reviews (Aug. 6, 1999).

We have reviewed these rules carefully and conclude that conscientiously applied, they provide reasonable assurance of fair consideration of a petitioner's application for parole pending removal. We are aware that in a similar case, a five-judge District Court in the Western District of Washington required that detainees receive a hearing before an immigration judge with a right of appeal to the Bureau of Immigration Appeals. Phan v. Reno, ___ F. Supp. 2d ___, Nos. C98-234Z, C99-177C, C99-185R, C99-341WD, C99-151L, 1999 WL 521980, at *7 (W.D. Wash. July 9, 1999). That Court noted its dissatisfaction with earlier INS review procedures, reciting criticism that "Directors simply relied on the aliens' past criminal history and the fact that they were facing removal from the United States, summarily concluding that the aliens posed such risks and denying them release." Id. We agree that such superficial review is not satisfactory and does not afford due process.

The Interim Rules, subsequently announced by the INS, appear on their face to satisfy Phan's objections. Among other things, the rules require an individualized analysis of the alien's eligibility for parole, present danger to society and willingness to comply with the removal order. Moreover, they do not result in placing additional cases on the already overloaded dockets of immigration judges.

The Interim Rules apply to petitioner, regardless of whether one concludes that he is being detained under the former or present versions of the Immigration Act. Our reading of the Interim Rules suggests that they will encourage good faith review. So long as petitioner will receive searching periodic reviews, the prospect of indefinite detention without hope for parole will be eliminated. In these circumstances, due process will be satisfied.

We do not intend to create a new legal fiction that allows for de facto indefinite detention based upon reviews that are comprehensive in theory but perfunctory in fact. Thus, if experience should show that our initial reaction to the Interim Rules or eventual permanent regulations was too sanguine, there will be time enough to consider the more extensive methods suggested by the Phan Court.

The petitioner has not yet received the rigorous review of his eligibility for parole that due process requires.

15

Accordingly, the order of the District Court will be reversed and the case remanded with directions that the petition for a writ of habeas corpus be granted and the petitioner released unless within 30 days the INS begins the review process for petitioner under the Interim Rules set out in the Appendix to this opinion (or under permanent regulations that are at least as favorable to him). We neither express nor intimate any views as to whether petitioner should be released on parole as a result of review under the Interim Rules.

16

APPENDIX

INTERIM PROCEDURES

(1)     Pursuant to the provisions of 8 C.F.R. S 241.4, the
        District Director will continue to conduct a custody
        review of administratively final order removal cases
        before the ninety-day removal period mandated by
        S 241(a)(1) expires for aliens whose departure cannot
        be effected within the removal period.

(2)     These procedures apply to any alien ordered removed
        who is inadmissible under S 212, removable under
        237(a)(1)(C), 237(a)(2), or 237(a)(4) or who has been
        determined by the Attorney General to be a risk to the
        community or unlikely to comply with the order of
        removal. They cover aliens convicted of an aggravated
        felony offense who are subject to the provisions of old
        INA S 236(e)(1)-(3), and non-aggravated felon aliens
        with final orders of exclusion. Mariel Cubans are
        excluded from these procedures as parole reviews for
        them are governed by 8 C.F.R. S 212.12. The ninety-
        day review will be conducted pursuant to the
        instructions set out in the memoranda of February 3
        and April 30, 1999. District Directors may, in their
        discretion, interview the alien if they believe that an
        interview would facilitate the custody review.

(3)     Following expiration of the ninety-day removal period,
        the next scheduled review provided by the District
        Director shall be nine months from the date of thefinal
        administrative order of removal or six months after the
        last review, whichever is later. Written notice shall be
        given to each alien at least 30 days prior to the date of
        the review. The notice will be provided either by
        personal service or certified mail/return receipt. The
        notice shall specify the factors to be considered and
        explain that the alien will be provided the opportunity
        to demonstrate by clear and convincing evidence that
        he is not a threat to the community and is likely to
        comply with the removal order.

(4)     For the review discussed in paragraph 3 above, an
        interview is mandatory and the District Director's

17

preliminary decision will be subject to Headquarters review. Thereafter, custody reviews will be conducted every six months, alternating between District Director file reviews and a review that includes the opportunity for an interview at the alien's request and a Headquarters review of detention decisions. A separate notice will advise the alien of the opportunity for the interview. The alien may check the appropriate box on the notice, returning the form provided within 14 calendar days so that an interview may be scheduled. The District Director has the discretion to schedule further interviews if he determines they would assist him in reaching a custody determination.

(5)     The alien must be advised that he may submit any information relevant to support his request for release from detention, either in writing, electronically, by U.S. mail (or any combination thereof), or in person if an interview is conducted. The alien must also be advised that he may be represented by an attorney, or other person at no expense to the government. If an interview has been scheduled, the alien's representative may attend the review at the scheduled time.

(6)     The District Director may delegate custody decisions to the level of the Assistant District Director, Deputy Assistant District Director, or those acting in their capacity. Custody determinations will be made by weighing favorable and adverse factors to determine whether the detainee has demonstrated by clear and convincing evidence that he does not pose a threat to the community, and is likely to comply with the removal order. See 8 C.F.R. S 241.4. The alien's past failure to cooperate in obtaining a travel document shall be considered an adverse factor in determining eligibility for release. See INA S 241(a)(1)(C) Suspension of Period. The fact that the alien has a criminal history does not create a presumption in favor of continued detention.

(7)     Within thirty days of the District Director's custody review, the alien must receive written notification of a custody decision. All notification will be provided either

18

by personal service or certified mail/return receipt. A decision to release should specify the conditions of release. A decision to detain will clearly delineate the factors presented by the alien in support of his release, and the reasons for the District Director's decision.

(8)     With respect to those detain decisions that are subject to Headquarters review under paragraph 4, the District Director's determination that the alien should be detained is to be regarded as only preliminary. In those instances, the Regional Directors will forward the preliminary detain decisions to Headquarters for review. Headquarters review will be conducted by Operations and Programs representatives (with assistance from the Office of General Counsel as necessary). Where the Headquarters reviewer's decision concurs with the District Director's, the Headquarters reviewer will write a supporting statement and will seek concurrence from a second Headquarters reviewer. Where the two reviewers differ, a panel of three Headquarters reviewers will conduct a further review of the case. The Headquarters panel may ratify the District Director's decision, return the case to the District Director to reconsider his decision, or determine that additional information is required to make a decision. The Headquarters review must be completed within thirty days of file receipt. The Headquarters review conclusions will be forwarded to the Regional Director for distribution to and appropriate action by the District Director.

(9)     The District Director will review his decision in light of the Headquarters recommendations and will notify the alien of the final custody determination within thirty days of completion of the Headquarters review.

(10)    The District Director should make every effort to effect the alien's removal both before and after expiration of the removal period. All steps to secure travel documents must be fully documented in the alien's file. However, if the District Director is unable to secure travel documents locally after making diligent efforts to do so, then the case shall be referred to Headquarters OPS/DDP for assistance. More detailed

19

instructions will be issued from the Executive Associate Commissioner for Operations by separate memorandum.

(11)   On August 30, 1999, and on the last workday of each quarter (September, December, March, June) each district shall submit a custody review status report to its Regional office and to Headquarters. There will be more detailed instructions issued on reporting procedures at a later time.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

20