**Moushataq Jalal KORKEES,
Petitioner,**

v.

**Janet RENO, Attorney General,
Respondent.**

**No. 4:00–CV–1044.**

United States District Court,
M.D. Pennsylvania.

April 2, 2001.

Melinda C. Ghilardi, First Assistant Federal Public Defender, Scranton, PA, for petitioner.

Mary Catherine Frye, U.S. Attorney's Office, Harrisburg, PA, David Barasch, U.S. Attorney's Office, Harrisburg, PA, for respondent.

*OPINION*

MUIR, District Judge.

### I. Introduction.

On June 12, 2000, Moushtaq Jalal Korkees, an inmate in the custody of the Immigration and Naturalization Service ("INS") and incarcerated at the Snyder County Prison, Selinsgrove, Pennsylvania, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 in which he challenges his continued detention by the INS.

This case was assigned to us but referred to Magistrate Judge J. Andrew Smyser for preliminary consideration. On June 15, 2000, Magistrate Judge Smyser granted Korkees, request to proceed in forma pauperis and ordered that the Attorney General show cause why Korkees, petition should not be granted. A response was filed by the Attorney General on July 5, 2000, and a reply from Korkees was filed on July 17, 2000. On August 1, 2000, Magistrate Judge Smyser directed that the government file a supplemental response which was filed on August 16, 2000.

On September 11, 2000, Magistrate Judge Smyser filed a report in which he recommended that Korkees' petition for writ of habeas corpus be denied and the case file be closed. No objections were filed to the report.

By order of October 6, 2000, we adopted the report of Magistrate Judge Smyser and denied Korkees, petition for writ of habeas corpus. We, however, stated in footnote 2 of our order that "[t]he review [by the INS] in this case appears to be borderline 'comprehensive in theory but perfunctory in fact.' In the future it would be helpful to have a more detailed explanation of the decision to deny parole."

On March 6, 2001, Korkees filed a document entitled "Motion for Reconsideration Under Rule 60(b)." Attached to that motion was an affidavit from Korkees' alleged victim. In that affidavit the victim, Anastasia Karjo, a sister-in-law of Korkees, stated in part as follows:

(3) That I made false statements and allegations to wit: alleging that Moushtaq Korkees, sexually assaulted me, when in fact no such conduct occurred.

(4) That I made the allegations to get Moushtaq Korkees convicted because I was jealous and young.

Also attached to the motion was a decision of the INS dated January 17, 2001, denying Korkees parole. Because that decision appeared to be based on a superficial review and did not explain why Korkees is a flight risk or a threat to the community, we appointed counsel for Korkees and scheduled a hearing on Korkees' motion for reconsideration.

On March 27, 2001, a hearing was held on Korkees' motion for reconsideration. The following are the court's findings of fact, discussion and conclusions of law.

### II. Findings of Fact.

1. Petitioner Moushtaq Korkees is a citizen and native of Iraq. (Undisputed, hereinafter "U")

2. Korkees entered the United States on February 4, 1994, at New York, New York. (U)

3. Korkees entered the United States as a Conditional Resident. (U)

4. The Immigration and Naturalization Service (INS) has in its possession a passport which indicates that Moushtaq Korkees is a native of and a citizen of Iraq. (U)

5. Korkees was married to Antonietta Karjo, an American citizen, in Aman, Jordan, on November 18, 1993.(U)

6. In 1996 the Prosecuting Attorney of Macomb County, Michigan, charged Korkees in a four count information with the following:

Count 1: CRIMINAL SEXUAL CONDUCT FIRST DEGREE (RELATIONSHIP) did engage in sexual penetration to wit: digital/vaginal with Anastasia Karjo, said victim being at least 13 but less than 16 years of age, to wit: age 15, and the defendant being a member of the same household as the victim;

COUNT 2: CRIMINAL SEXUAL CONDUCT FIRST DEGREE (RELATIONSHIP) did engage in sexual penetration to wit: oral/penal with Anastasia Karjo, said victim being at least 13 but less than 16 years of age, to wit: age 15, and the defendant being a member of the same household as the victim;

COUNT 3: CRIMINAL SEXUAL CONDUCT FIRST DEGREE (RELATIONSHIP) did engage in sexual penetration to wit: vaginal/penal with Anastasia Karjo, said victim being at least 13 but less than 16 years of age, to wit: age 15, and the defendant being a member of the same household as the victim;

COUNT 4: CRIMINAL SEXUAL CONDUCT SECOND DEGREE (RELATIONSHIP) did engage in sexual contact with another person, to wit: Anastasia Karjo, said victim being at least 13 but less than 16 years of age, to wit: age 15, and the defendant being a member of the same household as the victim.

See Doc. 6, Petitioner's Reply to Respondent's Response to Habeas Corpus Petition, Exhibits 5 and 6.

7. Anastasia Karjo is Korkees' sister-in-law and second cousin.

8. The charges were brought against Korkees pursuant to Michigan Penal Code, Chapter 750, Sections 520b(1)(b) and 520c(1)(b) based on his relationship to Anastasia Karjo and the fact that he lived in the same household. Id.

9. Section 520b(1)(b) provides in relevant part as follows:

(1) A person is guilty of criminal sexual conduct in the first degree if the person engages in sexual penetration with another and if any of the following circumstances exists:

\* \* \* \* \* \*

(b) That other person is at least 13 but less than 16 years of age and any of the following:

(i) The actor is a member of the same household as the victim.

(ii) The actor is related to the victim by blood or affinity to the fourth degree.

10. Section 520c(1)(b) provides in relevant part as follows:

(1) A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another and if any of the following circumstances exists:

\* \* \* \* \* \*

(b) That other person is at least 13 but less than 16 years of age and any of the following:

(i) The actor is a member of the same household as the victim.

(ii) The actor is related to the victim by blood or affinity to the fourth degree.

11. Michigan Penal Law defines "sexual penetration" as follows:

(1) "Sexual penetration" means sexual intercourse, cunnilingus, fellatio, and intercourse, or any other intrusion, however slight, of any part of a person's body or any object into the genital or anal openings of another person's body, but emission of semen is not required.

M.C.L.A. 750.520a(*l* ).

12. Michigan Penal Law defines "sexual contact" as follows:

(k) "Sexual contact" includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immedi-

ate area of the victim's or actor's intimate parts, it that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification.

M.C.L.A. 750.520a(k).

13. Korkees was released on bond in his criminal case without incident. (U)

14. Korkees never failed to appear for any court proceedings in his criminal case. (U)

15. On January 23, 1997, Korkees pled guilty to a charge of criminal sexual conduct of the second degree, in Macomb County Circuit Court, Mt. Clemens, Michigan.

16. On March 25, 1997, Korkees was sentenced to a term of probation of three years. See Doc. 6, Petitioner's Reply to Respondent's Response to Habeas Corpus Petition, Exhibits 5.

17. As a condition of probation Korkees was obliged to serve the first 180 days incarcerated in the Macomb County jail with credit for 22 days served. Id.

18. Korkees does not have any other arrests or convictions. (U)

19. The INS initiated removal proceedings against Korkees on June 10, 1997, when it issued a Notice to Appear. (U)

20. The INS charged Korkees with being deportable under Section 237(a)(2)(i) of the Immigration and Nationality Act (conviction of a crime of moral turpitude for which a sentence of one year or longer may be imposed) and Section 237(a)(2)(A)(iii) of the Act (conviction of an aggravated felony). (U)

21. Korkees was incarcerated in the Macomb County Jail from March 25, 1997, until September 9, 1997, when he was turned over to the INS. (U)

22. Korkees has been detained in the custody of the INS continuously since September 9, 1997.(U)

23. An Immigration Judge ordered Korkees removed from the United States to Iraq on October 10, 1997.(U)

24. Korkees did not appeal the Immigration Judge's order. (U)

25. The order of removal became final on November 10, 1997.(U)

25. Korkees never contested his deportation to Iraq. (U)

26. Korkees has assisted the authorities in the removal process to the best of his ability. (U)

27. On four occasions the INS has considered Korkees for release on parole pending deportation.

28. Korkees had custody reviews on January 28, 1999, September 15, 1999, January 20, 2000, and August 15, 2000.(U)

29. The INS issued decisions on June 17, 1999, November 9, 1999, March 27, 2000, and January 17, 2001.(U)

30. The decisions on all four reviews were to continue detention. (U)

31. The decision of January 17, 2001, states in toto as follows:

This letter is to inform you that your custody status has been reviewed by the Immigration and Naturalization Service (INS) and that you will not be released from custody at this time.

This decision was based on a review of your file and consideration of information you submitted to INS' reviewing officials.

You are not being released because:

You have not shown through clear and convincing evidence that you are not a threat to society. You have presented the argument that you are going to have your conviction overturned. The Immigration and Naturalization Service is in receipt of the letters of support from your family members and the affidavit of the victim in your criminal case. Since

the Immigration and Naturalization Service has no control over criminal convictions, and no power to overturn these convictions, these statements should be made to the criminal court which handed down your conviction. That court and only that court can overturn your conviction. Since your criminal conviction has not been overturned the immigration charges against you are still valid. Pursuant to 241(a)(6) of the INA, "an alien ordered removed from the United States under 237(a)(2) who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, (sic) may be detained beyond the removal period." Therefore, you will not be released at this time.

32. The decision of January 17, 2001, fails to state why Korkees is a threat to the community or a risk of flight.

33. The INS has attempted to obtain travel documents so Korkees could be deported to Iraq. (U)

34. On December 15, 1997, an emergency travel document was requested through the Consulate of the Democratic and Popular Republic of Algeria, Iraqi Interests Section. (U)

35. On March 12, 1998, Deportation Officer Ursel G. Staples contacted Ms. Heifa of the Iraqi Interests Section of the Algerian Consulate Office in Washington, D.C. (U)

36. Ms. Heifa informed Deportation Officer Staples. that it is necessary to send a diplomatic message into Iraq in order to have a request considered for issuance of a travel document. (U)

37. Ms. Heifa informed Deportation Officer Staples that the Iraqi Interests Section had not been in communication with Iraq for over a year. (U)

38. On March 23, 1998, Deportation Officer Staples wrote a Memorandum to Bob Obenshaim at HQDDP. (U)

39. Deportation Officer Staples stated that "[a]ttempts to obtain travel documents have proven unsuccessful. I spoke with Ms. Heifa of the Iraqi Interests Section on March 12, 1998, and she informed that getting a travel document for any of the aliens for whom I have request pending is slim to none." (U)

40. On April 7, 1998, Deportation Officer Staples sent a presentation packet to Bob Obenshaim. (U)

41. On September 23, 1998, assistance was requested from the Removal Unit Headquarters. (U)

42. On June 11, 1999, an additional request for assistance was made to the Removal Unit Headquarters. (U)

43. On June 16, 1999, Patrick M. O'Reilly sent an email message to Tim Shearon, with a carbon copy to Deportation Officer Dave O'Neil, indicating that the request for travel documents was still pending at the Algerian Embassy. (U)

44. More than a year later, Deportation Officer John C. Crosson stated in his August 15, 2000, review that ". . . the likelihood of obtaining a travel document for this individual is very slim. All efforts have been made to accomplish just that without any success." (U)

45. On September 26, 2000, Deportation Officer Crosson was advised in an email from Lisa Hoechst, Staff Officer at INS, that the INS was still dealing with the Consulate of Algeria, Iraqi Interests Section and that they were "having no luck with them." (U)

46. Iraq has not issued any travel documents for Korkees. (U)

47. The duration of Korkees' incarceration is uncertain. (U)

48. The INS has offered no description of the efforts it will employ in the future to effectuate Korkees' deportation.

49. There is no factual basis for concluding that Iraq will issue travel documents in the foreseeable future because the United States does not maintain diplomatic ties with [Iraq]. (U)

50. Korkees has been in INS custody for approximately 43 months. (U)

51. Korkees has been in INS custody for approximately 41 months since his order of removal became final. (U)

52. Korkees is a deportable alien rather than an excludable alien .[1] (U)

53. During the four years Korkees has been incarcerated on both his criminal conviction and INS detention, he has been housed in five county jails, i.e., Macomb County Prison, Newaygo County Prison, York County Prison, Snyder County Prison and Lackawanna County Prison. (U)

54. Korkees received only one disciplinary infraction during this period of time. (U)

55. While in INS custody, Korkees was cited for refusing to obey an order on June 8, 1998.(U)

56. As noted by Deportation Officer Crosson in his August 15, 2000, review, "[t]he incident was a hunger strike in which a group of detainees in INS custody in Detroit were trying to get a release from custody or change in facilities. It appears from the report that the aliens had no contact with the deportation section in Detroit and this was an appeal for attention to their cases." (U)

57. Deportation Officer Crosson in his August 15, 2000, review recommended that Korkees be released.

58. The recommendation of Mr. Crosson was overruled by his supervisor, John A. Lawton.

59. Mr. Lawton in overruling the recommendation of Mr. Crosson stated as follows:

> When the detainees (sic) conviction for rape is overturned by the courts and victim or victims concur consideration should be made for possible release.

60. On September 22, 1999, the Warden of Snyder County Prison prepared a Letter of Facts stating that Korkees was committed to the Snyder County Prison on October 30, 1998, that he had a clear conduct record and he worked as a kitchen trustee for 10 months, that he received tutoring in English as a second language and occasionally attended church services, and that his overall general adjustment while confined was good. (U)

61. On July 10, 2000, the Warden of the Snyder County Prison prepared a second Letter of Facts stating that Korkees had a clear conduct record while at the prison for twenty months, that he was a kitchen trustee and participated in the Drug and Alcohol, Stress and Anger Management and Adult Literacy Programs, that he received a letter of commendation and certificate of recognition from the Warden for immediately responding to an emergency situation involving another inmate, and that his overall adjustment while confined was very good. (U)

---

1. Aliens not formally admitted into the United States were known as "excludable" aliens because they were subject to exclusion proceedings. Lawfully admitted aliens who later were sought to be removed were known as "deportable" aliens because they were subject to removal from the United States through deportation proceedings. The immigration laws have now been changed to refer to exclusion and deportation proceedings as "removal" proceedings, with "excludable" aliens now referred to as "inadmissible" aliens.

62. On May 7, 2000, Korkees assisted another inmate who set his own jumpsuit on fire. (U)

63. On May 8, 2000, Korkees received a Certificate of Recognition from the Warden of the Snyder County Prison. (U)

64. On May 9, 2000, the Warden sent Korkees a Letter of Commendation. (U)

65. Anastasia Karjo told Mark Jebson, Assistant District Counsel, on March 1, 1998, that Korkees threatened to kill her on numerous occasions if she did not help with his deportation trial. (U)

66. Anastasia Karjo told Mark Jebson on March 1, 1998, that she was subpoenaed to testify at Korkees deportation trial. (U)

67. Anastasia Karjo asked Mark Jebson on March 1, 1998, to determine when the deportation trial was scheduled. (U)

68. Anastasia Karjo told Mark Jebson on March 1, 1998, that she feared for her life and believed that Korkees would kill her if he [is] not deported or released from custody. (U)

69. Mark Jebson reviewed Korkees file on March 9, 1998, and determined that Korkees had already been ordered deported to Iraq in October, 1997.(U)

70. Mark Jebson could not locate a subpoena for Anastasia Karjo in Korkees' file. (U)

71. Mark Jebson sent a Memorandum to Deportation Officer Staples on March 9, 1998, requesting Korkees not be released until he or Anastasia Karjo were contacted. (U)

72. Anastasia Karjo indicated in a handwritten statement to the Sterling Heights Police Department dated June 22, 1999, that the sexual assault did not occur. (U)

73. Anastasia Karjo indicated in an affidavit dated January 9, 2001, that the sexual assault did not occur. (U)

74. Anastasia Karjo stated that she lied in her previous statements to the police because she was jealous and young, and she was mad at Korkees. (U)

75. Anastasia Karjo testified before this court that her claim made in the Michigan criminal court proceedings that Korkees sexual assaulted her was false.

76. As a result of Anastasia Karjos recantation, Korkees has attempted to retain counsel to petition to have his criminal conviction set aside.

77. Korkees because of financial reasons has been unable to obtain counsel to set aside his conviction.

78. Korkees' wife stated that she and members of his immediate family had sought the services of 3 attorneys to set aside Korkees' conviction but their charges of $3000 were so high the family could not afford to engage them.

79. Korkees' conviction has not been vacated or overturned. (U)

80. If Korkees is released on parole, he will reside with his wife, Antonietta Karjo, and six year old son, Andrew Karjo, at 17017 West Nine Mile Avenue, Southfield, MI 48076.(U)

81. If Korkees is released on parole, his mother-in-law and father-in-law, Susan and Azziz Karjo, have extended an offer for him to reside with them. (U)

82. Sherry Yousif is the President of Allstar Collision, Inc. (U)

83. Ms. Yousif wrote a letter indicating that Korkees was one of the best employees she had because he was reliable, dependable and motivated when it came to hard work. (U)

84. Ms. Yousif also noted that it would be a pleasure to have Korkees back on her team. (U)

85. Ms. Yousif submitted an additional letter in anticipation of the evidentiary hearing. (U)

86. Ms. Yousif was unable to attend the evidentiary hearing because she was subpoenaed to appear at another court proceeding in Detroit on the day of the evidentiary hearing. (U)

87. Ms. Yousif indicated that Korkees was a hard working and very honest employee. (U)

88. Ms. Yousif stated that Korkees worked for her company for quite a while. (U)

89. Ms. Yousif stated that Korkees has the ability to grow with her company and that he will be an asset to her organization. (U)

90. If Korkees is released on parole, he will be employed full-time at Allstar Collision, Inc., 11380 East McNichols, Detroit, MI 48234, where he was employed prior to his incarceration. (U)

### III. Discussion.

■ Once an alien such as Korkees is ordered deported, the INS is afforded a 90–day period in which to effect deportation. 8 U.S.C. § 1231(a)(1)(A). The alien is subject to mandatory detention during that initial 90–day period. § 1231(a)(2). After expiration of the 90–day period, the alien may be released on "parole" subject to conditions. § 1231(a)(3). In reviewing parole decisions of the INS, the standard of review is limited to whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Moret v. Karn*, 746 F.2d 989, 991 (3d Cir.1984). The Court of Appeals for this circuit in *Karn* stated that "Supreme Court precedent makes clear, a court must evaluate the propriety of an agency action solely on the grounds invoked by the agency in the initial determination." *Id.* at 992. Furthermore, if the

"grounds are inadequate or improper the agency action must be set aside." *Id.*

■ The Court of Appeals for this circuit has observed that "[w]hen detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable. The fact that some aliens posed a risk of flight in the past does not mean they will forever fall into that category. Similarly, presenting danger to the community at one point by committing crime does not place them forever beyond redemption." *Ngo v. Immigration and Naturalization Service*, 192 F.3d 390, 398 (3d Cir.1999). The Court of Appeals also stated that

> case law holds there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

*Id.* at 397. The above three factors must be evaluated to determine whether the INS's detention of Korkees is lawful. This evaluation involves a balancing of the factors. *Cf. Kay vs. Reno*, 94 F.Supp.2d 546, 551 (M.D.Pa.2000) (Rambo, J.); see also *Phan v. Reno*, 56 F.Supp.2d 1149, 1156 (W.D.Wash.1999) (The court "must necessarily balance the likelihood that the government will be able to effectuate deportation, against the dangerousness of a petitioner and the likelihood that he will abscond if released.").

There can always be a possibility of an alien departing this country. However, when the possibility of departure is slight the risk of flight or threat to the community takes on greater significance. In other words where the possibility of departure is

unlikely, there must be clear evidence that, the detention is "*necessary* to prevent a risk of flight or a threat to the community." *Ngo*, 192 F.3d at 392 (emphasis added). Furthermore, "[d]ue process is not satisfied ... by rubberstamp denials [of parole] based on temporally distant offenses." *Id.* at 398.

The findings of fact set forth in Part II of this opinion demonstrate that it is highly unlikely that Korkees will be deported to Iraq. The possibility of Korkees' departure from this country is, as Deportation Officer Crosson stated, "very slim." The first factor weighs heavily in Korkees' favor.

We will now address the second factor. The Court of Appeals in *Ngo* approved parole procedures that required "reviews every six months." 192 F.3d at 399. Contrary to the procedure approved of by the Court of Appeals in *Ngo*, Mr. Lawton testified that reviews are presently being conducted on a yearly basis. The INS in the last twelve months has only conducted one review of Korkees' case. Furthermore, there was a significant delay of five months by INS Acting District Director, Philadelphia, in issuing a final decision. The second factor also weighs strongly in Korkees' favor.

 With regard to Korkees' risk of flight, Mr. Lawton admitted that Korkees was not a risk of flight. As for Korkees' threat to the community the INS in its decision of January 17, 2001, did not explain why he was a threat. That decision appears to be a "rubberstamp" or perfunctory denial of parole disapproved of by the Court of Appeals for this circuit in *Ngo*. It

appears that the only justification put forward by the INS for continued detention of Korkees is that he is a threat to the community because he has been convicted of a crime. The mere conviction of a crime is not an adequate basis for finding that an individual is a threat to the community. Furthermore, the fact that Korkees does not accept responsibility for the crime of which he was convicted in Michigan is an inadequate basis to conclude that detention is *necessary* to prevent a threat to the community. There is no evidence that while imprisoned Korkees engaged in violent or threatening behavior. Also, there is no evidence that after being taken into custody by the INS he violated the regulations and rules of the facilities in which he was imprisoned, other than engaging in a hunger strike in an attempt to get the attention of the INS. With regard to the state criminal charge, Korkees prior to being sentenced was released on bond, never missed a court appearance and followed the release restrictions. Furthermore, Korkees is married to a United States citizen and has a job offer from Allstar Collision, Inc. In light of our findings of fact set forth in Part II we cannot conclude that detention is necessary to prevent a risk of flight or a threat to the community. The third factor also weighs heavily in Korkees' favor.

Regulations have been adopted by the INS that describe detailed conditions of release for aliens. 8 C.F.R. § 241.5.[2] These conditions are sufficient to prevent any risk of flight or threat to the community. We will grant Korkees' motion for

---

**2.** Section 241.5 authorizes the imposition of several conditions upon the release of an alien subject to a final order of deportation, including that the alien report to a specified officer periodically, continue efforts to obtain a travel document, obtain advance approval of travel beyond specified distances, and provide the INS with written notice of any change of address. The INS may require that Korkees reside at an address other than where Anastasia Karjo resides. The INS should not require bail in such an amount that Korkees is unable to meet the requirement.

reconsideration and petition for writ of habeas corpus.

### IV. Conclusions of Law.

1. The INS has failed to demonstrate that there is a reasonable possibility of Korkees' eventual deportation, that there are adequate and reasonable provisions for the granting of parole and that detention is necessary to prevent a risk of flight or a threat to the community.

2. The reasons set forth by the INS for denying Korkees parole set forth in its decision of January 17, 2001, are inadequate and improper. *Moret v. Karn*, 746 F.2d 989, 992 (3d Cir.1984).

An appropriate order will be entered.

### ORDER

1. Korkees' motion for reconsideration (Doc. 13) is granted.

2. Korkees, petition for writ of habeas corpus is granted.

3. The INS shall within 10 days release Korkees from confinement pursuant to the conditions of 8 C.F.R. § 241.5.

4. The Clerk of Court shall amend the caption of this case to reflect that Korkees' first name is spelled "Moushtaq."