Evelio Carvajal **CABALLERO,**
Petitioner,

v.

**UNITED STATES, et al., Respondents.**

No. CIV A 00–2644.

United States District Court,
D. New Jersey.

May 18, 2001.

John M. Grogan (argued), Sandals & Langer, L.L.P., Philadelphia, PA, Attorney for Petitioner.

Robert J. Cleary, United States Attorney, by Paul A. Blaine, Asst. U.S. Attorney, United States Attorney's Office, Camden, NJ, Attorney for Respondent United States of America.

Joshua E. Braunstein (argued), Office of INS Litigation–Civil Division, United States Department of Justice, Washington, DC, Attorney for Respondent INS.

OPINION

RODRIGUEZ, District Judge.

Petitioner comes before this court seeking a Writ of Habeas Corpus pursuant to

28 U.S.C. § 2241. For the reasons that follow, this Court must deny the Petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was born in Havana, Cuba on September 15, 1942. (Answer, Ex. 3.) His grandparents primarily raised him, and he married in 1970. (*Id.*) His wife gave birth to two children before they separated or divorced in 1979. (*Id.*) A year prior, in 1978, he began a seven year sentence in Cuba for anti-revolutionary activities. (*Id.*) Both of his children have emigrated to the United States. (*Id.*)

During Petitioner's incarceration in Cuba, in April 1980, six Cubans broke through the gates of the Peruvian Embassy in Havana, Cuba, seeking asylum. Yvette M. Mastin, Comment, *Sentenced to Purgatory: The Indefinite Detention of Mariel Cubans*, 2 Scholar 137, 142 (2000); Birgitta I. Sandberg, Note, *Is the United States Government Justified in Indefinitely Detaining Cuban Exiles in Federal Prisons?*, 10 Dick J. Int'l L. 383, 384 (1992). When Peru granted asylum to those six Cubans, the Cuban government responded by removing its guards from around the Peruvian Embassy and declaring the embassy open to all. Sandberg, *supra*, at 384. When 10,000 asylum-seekers then overwhelmed the Peruvian Embassy, Castro opened the Cuban port of Mariel to Cubans in the United States to come and get their relatives. *Id.*

In response, President Carter welcomed the Cubans with "open arms," anticipating an influx of approximately 20,000 Cubans. *Id.; see also* Mastin, *supra*, at 142–43. Approximately 125,000 Cubans eventually came to the United States at the time. Sandberg, *supra*, at 384; Mastin, *supra*, at 143. In the United States, the media attributed the influx of Cubans to Castro releasing prisoners and psychiatric hospi-

tal patients to the United States. *See* Mastin, *supra*, at 144. An INS official reported to the media that "85% of the Mariel Cubans were 'convicts, robbers, murderers, homosexuals and prostitutes.'" Mastin, *supra*, 144 (quoting Mark S. Hamm, The Abandoned Ones: The Imprisonment and Uprising of the Mariel Boat People 52 (1995)). In reality, the INS eventually determined that less than 1% of the Mariel Cubans had serious criminal backgrounds. Mastin, *supra*, at 146.

Petitioner arrived in the United States on May 14, 1980 as part of this event, (Answer, Ex. 3), which is labeled the Mariel Boatlift. On July 29, 1980, Petitioner's cousin sponsored him to Passaic, New Jersey. (Answer, Ex. 3.) Shortly thereafter, Petitioner began involvement in criminal activity. Between May 1982 and February 1985, Petitioner was apparently indicted for marijuana possession, cocaine possession (three times), murder, aggravated assault (twice), kidnaping, and making threats. (Answer, Ex. 3.) Of those indictments, it appears that Petitioner was convicted only of aggravated assault (once) and cocaine possession (once). (Answer, Exs.3, 5.) In March 1985, the INS revoked Petitioner's parole, and during his detention he tested positive for marijuana. (Answer, Ex. 3.)

In May 1988, the INS released Petitioner to the sponsorship of his commonlaw wife, whom he met during his first year in the United States. (Answer, Ex. 3.) In 1989, Petitioner appears to have served three months in prison for assault, trespassing, and intimidation, (Answer, Ex. 3.), and received three years probation for possession of a controlled substance with intent to distribute, (Answer, Ex. 5.) In October 1991, Petitioner received a twelve-year sentence for using a knife in the course of stealing a loaf of bread. (Petition at App.)

In September 1996, the INS took Petitioner into custody and revoked his parole the same month. (Answer, Exs.1–2.) At that time, the Bureau of Prisons conducted a psychological evaluation and recommended that Petitioner should not be released, except to a secure, long-term halfway house with a well-supervised substance abuse program able to work with individuals having antisocial personality disorder with a chemical dependency. (Answer, Ex. 3.)

A Cuban Review Panel[1] interviewed Petitioner on October 23, 1996 (Answer, Exs.4–5), March 4, 1998 (Answer, Exs.7–10), and May 3, 1999 (Answer, Exs.14–19). Each time, the Panel denied parole to Petitioner. (Answer, Exs.6, 11, 20.) On April 25, 2000, the Cuban Review Panel again interviewed Petitioner. (Answer, Exs.21–23.) Apparently satisfied that Petitioner was not then violent and was likely to remain non-violent, the Panel recommended Petitioner's release to a halfway house near his daughter's residence to obtain employment and reunite with his family. (Answer, Ex. 22.) A mental health evaluation conducted on May 3, 2000 recommended "placement in a residential halfway house program and substance abuse treatment ... to reduce risk of relapse and return to criminal lifestyle." (Answer, Ex. 23.) A notice of releasability was issued on July 24, 2000.[2] (Answer, Ex. 24.)

Petitioner filed the instant application seeking an order for release from custody on June 21, 2000. Petitioner contends that the INS is denying him due process of law. He seeks either (1) an evidentiary hearing

to determine whether he should have been released on parole, considering all of petitioner's circumstances; (2) an order of release under supervision; or (3) a hearing on his application for release by an Immigration Judge. By Order dated December 8, 2000, this Court determined that the regulatory parole scheme developed for Mariel Cubans, *see* Parole Determinations and Revocations Respecting Mariel Cubans, 8 C.F.R. § 212.12 (2001), appeared to satisfy the due process rights afforded to inadmissible aliens under the Third Circuit's decision in *Chi Thon Ngo v. INS*, 192 F.3d 390 (3d Cir.1999).

This Court became concerned, however, that Petitioner may have a right to equal protection under the Fifth Amendment and that the INS may have violated that right by enacting different parole schemes for Mariel Cubans from those afforded to all other inadmissible aliens under the Interim Procedures discussed by the Third Circuit in *Ngo*, and subsequently enacted in substantially the same form as federal regulations. *See* Continued Detention of Inadmissible, Criminal, and Other Aliens Beyond the Removal Period, 8 C.F.R. § 241.4 (2001). Because of the complex nature of the constitutional question, John Grogan, Esq., was appointed counsel for Petitioner, and the parties were directed to filed briefs on the equal protection issue. Oral argument was heard on April 2, 2001.

## II. RELEVANT IMMIGRATION LAW BACKGROUND

This decision becomes more clear when considered in the context of the rights of inadmissible aliens as defined in caselaw.

---

1. The parole review process for Mariel Cubans, known as the Cuban Review Plan, is codified at Parole Determinations and Revocations Respecting Mariel Cubans, 8 C.F.R. § 212.12 (2001).

2. Respondent has suggested that this case may be or will be moot because Petitioner has been determined releasable and will be released. This Court disagrees. *See Rosales–Garcia v. Holland*, 238 F.3d 704, 713–14 (6th Cir.2001).

Federal courts distinguish between deportable aliens and inadmissible aliens.[3] Deportable aliens were successful in obtaining entry to the United States, legally or illegally; while an inadmissible alien seeks admission into the United States and, even if physically present, is considered detained at the border. *See Chi Thon Ngo v. INS*, 192 F.3d 390, 394–95 & n. 4 (3d Cir.1999); *Marroquin–Manriquez v. INS*, 699 F.2d 129, 134 (3d Cir.1983). Deportable aliens have rights not available to inadmissible aliens because they have achieved entry into the United States. *See Landon v. Plasencia*, 459 U.S. 21, 26–29, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958).

### A. Shaughnessy v. United States ex rel. Mezei

In the midst of the McCarthy Era of the early 1950s, a majority of the Supreme Court held than an inadmissible alien has no right to a hearing on his exclusion. *See Shaughnessy v. United States ex rel. Mezei* 345 U.S. 206, 215, 216, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Immigration officials detained Mezei upon a re-entry into the United States, and he could not affect entry into any other country. *See id.* at 208–09, 73 S.Ct. 625. After twenty-one months in detention, a federal district court held that Mezei's continued detention without due process of law was illegal. *See id.* at 207–08, 73 S.Ct. 625.

The Supreme Court reversed. Even though the United States was restricting Mezei's movements, the Court found that it must treat him as though he had not landed on American soil. *See id.* at 213, 73 S.Ct. 625. Because he was not on American soil, he did not have a right to a hearing on his exclusion. *See id.* at 213–15, 73 S.Ct. 625.

Mezei's continued, and possibly indefinite, detention appeared not to disturb the Court.

> [W]e do not think that [Mezei]'s continued exclusion deprives him of any statutory or constitutional right. . . . That exclusion by the United States plus other nations['] inhospitality results in present hardship cannot be ignored. . . . Whatever our individual estimate of [Congress'] policy and the fears on which it rests, respondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate.

*Id.* at 215–16, 73 S.Ct. 625. Indeed, Mezei apparently remained detained until the executive branch released him "as a matter of grace." *See Trop v. Dulles*, 356 U.S. 86, 102 n. 36, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (citation omitted).

Four justices dissented from the *Mezei* decision. Justice Black, joined by Justice Douglas, stated that indefinitely depriving any individual of his liberty without a "fair open court hearing" violated the American concepts of a free society. *See id.* at 217–18, 73 S.Ct. 625 (Black, J., dissenting).

Justice Jackson, joined by Justice Frankfurter, wrote a separate dissenting opinion. Justice Jackson explained that exclusion of an alien without a hearing presented no problem, as long as the government can turn the alien back on land or return him to sea. *See id.* When indefinite detention becomes the only alternative, however, the government must pro-

---

**3.** Many of case citations discussed within refer to the rights of an excludable alien. Along with many other changes, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–546, effectively changed the terminology from excludable alien to inadmissible alien. This Court will use the more recent term.

vide procedural due process before taking an alien's liberty. *See id.*

"It overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound.... We must regard this alien as deprived of liberty, and the question is whether the deprivation is a denial of due process of law." *Id.* at 220–21, 73 S.Ct. 625 (Jackson, J., dissenting). Justice Jackson found that the executive branch had the power to detain an alien, as long as it accords him procedural due process. *See id.* at 224, 73 S.Ct. 625. He explained that the courts would surely not permit the government to drop an alien into the sea (the taking of life) or confiscate his valuables and money (the taking of property). *See id.* at 227, 73 S.Ct. 625. Indefinite detention fell somewhere between the two, as it is the taking of liberty. *See id.* He found that this "may be done only by proceedings which meet the test of due process of law." *See id.*

The *Mezei* "decision may be constitutionally infirm, even though it has never been overruled." Ronald D. Rotunda & John E. Nowak, 3 Treatise on Constitutional Law § 18.11, p. 465 (3d ed.1999.) As far back as 1896, the United States Supreme Court itself had recognized that the Constitution provides some protection to inadmissible aliens. In *Wong Wing v. United States,* the Court stated that the Constitution permits detention of inadmissible aliens, but that the government could not sentence an inadmissible alien to "hard labor" without providing the alien with due process. 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *see also Lynch v. Cannatella,* 810 F.2d 1363, 1370, 1373–74 (5th Cir.1987) (finding inadmissible aliens protected by the Fourth and Fifth Amendments from physical abuse by government officials); *United States v. Henry,* 604 F.2d 908, 912–13 (5th Cir.1979) (providing

Fifth Amendment rights to inadmissible aliens in criminal proceedings). *See generally Jean v. Nelson,* 472 U.S. 846, 873–74, 105 S.Ct. 2992, 86 L.Ed.2d 664 (Marshall, J., dissenting) (discussing the Fifth Amendment protections afforded to inadmissible aliens).

### B. The General Rule in Appellate Courts

■ Many of the federal courts of appeals have addressed the problem of an inadmissible alien detained by the United States who is unable to affect release into his home country or any other country. Overwhelmingly, the federal appellate courts have found that whatever rights such an inadmissible alien enjoys in the United States, a detention system that provides for periodic parole determinations does not violate those rights. *See Carrera–Valdez v. Perryman,* 211 F.3d 1046, 1048 (7th Cir.2000) (citing *Mezei* and determining that an inadmissible alien cannot constitutionally attack his indefinite detention); *Zadvydas v. Underdown,* 185 F.3d 279, 288–90 (5th Cir.1999), *cert. granted,* —— U.S. ——, 121 S.Ct. 297, 148 L.Ed.2d 239 (2000) (finding that an alien ordered departed is equivalent to an inadmissible alien and that such aliens have "some constitutional protections," which are not violated by indefinite detention with possibility of parole); *Guzman v. Tippy,* 130 F.3d 64, 66 (2d Cir.1997) (concluding that the INS may indefinitely detain inadmissible aliens and that the Fifth Amendment provides no due process rights because inadmissible aliens' process rights are restricted to those processes granted by Congress); *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1448–50 (9th Cir.1995) (holding that custody of inadmissible aliens with a parole procedure was not indefinite, but "a series of one-year periods of detention" and stating that inadmissible aliens have no constitutional right

to be free from detention); *Fernandez–Roque v. Smith,* 734 F.2d 576, 580–82 (11th Cir.1984) (concluding that parole is part of the admissions process, thus inadmissible aliens have no constitutional rights surrounding the parole); *Palma v. Verdeyen,* 676 F.2d 100, 103–04 (4th Cir.1982) (finding that the Constitution gives Congress the right to determine the rights of inadmissible aliens).

## C. Alternative Approaches

The Tenth Circuit and the Sixth Circuit have issued opinions that offer alternative approaches to interpreting *Mezei.* In *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1386–89 (10th Cir.1981), the Tenth Circuit interpreted then-existing immigration statutes and regulations as prohibiting the indefinite detention of inadmissible aliens. *See id.* at 1386–90. The Tenth Circuit "[n]evertheless" found that it should "discuss the serious constitutional questions involved." *See id.* at 1386. In this dicta, the Tenth Circuit found that an inadmissible alien "in physical custody within the United States may not be 'punished'" without the protections of the Fifth Amendment. *See id.* at 1387. The indefinite detention of an inadmissible alien whose country of origin would not accept his return deprived the alien of his liberty interest in being free from restraint. *See id.* The court in *Rodriguez–Fernandez* distinguished the Supreme Court's decision in *Mezei* because: (1) the

"focus of *Mezei* " was a due process hearing concerning re-entry, not parole; (2) the decision was made in the context of Mezei being a security risk during the Korean War; (3) the conditions of detention on Ellis Island were not comparable to the conditions of detention in maximum security prisons; and (4) Mezei eventually "voluntarily terminated" efforts to be deported to another country. *See id.* at 1388.

Construing a habeas petition by a Mariel Cuban, also an inadmissible alien, to challenge his detention "as impermissible punishment in the absence of trial," the Sixth Circuit recently applied a two-prong test, taken from *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987),[4] in determining whether the INS was violating a petitioner's substantive due process rights. *See Rosales–Garcia v. Holland,* 238 F.3d 704, 722–27 (2001). Applying the *Salerno* test, the court found that the detention violated the petitioner's Fifth Amendment rights. *See id.* at 726–27. The court ordered the petitioner released within 30 days. *See id.* at 727.

## D. Chi Thon Ngo v. INS

The Third Circuit recently visited this topic in *Chi Thon Ngo v. INS,* 192 F.3d 390 (3d Cir.1999). In *Ngo,* the INS paroled petitioner into the United States in 1982 as a refugee. *See id.* at 392. After convictions for possession of a firearm in 1988 and attempted robbery in 1989, the

---

**4.** In *Salerno,* outside of the immigration context, the Supreme Court held that the Bail Reform Act of 1984 did not deprive a prisoner of his liberty in violation of his Fifth Amendment substantive due process rights. *See* 481 U.S. at 752. The Court first determined that the detention of certain prisoners after arrest until before trial was not punitive. *See id.* at 746–48. The Court then determined that the government's interest in the detention outweighed the prisoner's liberty interest. *See id.* at 748–52.

*Salerno* has been read as creating a two-prong test when a federal law is challenged as an impermissible punishment without due process of law. *See Rosales–Garcia,* 238 F.3d at 722. The federal court must determine "(1) whether there is an alternative, non-punitive purpose which may rationally be assigned to the detention, and (2) whether the detention 'appears excessive in relation to the alternative purpose assigned [to it].' " *Id.* (quoting *Salerno,* 481 U.S. at 747) (alternations in *Rosales–Garcia*).

petitioner was ordered excluded and deported by an order that became final on July 6, 1995. *See id.*

At some point in 1995, the INS took the petitioner into custody. *See id.* Vietnam refused to take the petitioner back. *See id.* at 392, 395. After a failed petition for a writ of habeas corpus in December 1995, the petitioner applied again in November 1996, arguing that his detention violated due process of law. *See id.* at 392–93. The district court again denied the petition. *See id.* at 393.

The Third Circuit reversed. *See id.* at 399. Initially, the Third Circuit held that the INS had authority, pursuant to a grant from Congress, to detain an alien ordered deported whose country of origin would not allow their return for a prolonged period of time. *See id.* at 393–94. The court then examined whether the "indeterminable nature" of an inadmissible alien's detention could violate the United States Constitution. *See id.* at 396–99.

The Third Circuit began with the following background:

> Even an excludable alien is a "person" for purposes of the Fifth Amendment and is thus entitled to substantive due process. *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ("persons within the territory of the United States ... and ... even aliens ... [may not] ... be deprived of life, liberty[,] or property without due process of law"); *see also Lynch v. Cannatella,* 810 F.2d 1363, 1366 (5th Cir.1987 ) (excludable alien may not be subjected to brutality by government officials). In addition, procedural due process is available to aliens in some

circumstances. *See Landon v. Plasencia,* 459 U.S. 21, 32–33, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("a continuously present resident alien is entitled to a fair hearing when threatened with deportation ... [and] has a right to due process" before being required to leave the country).

*Id.* at 396. The Third Circuit then noted that, while the Supreme Court's decision in *Mezei* has been "much criticized," it is still controlling law. *See id.* It examined the law of its sister circuits and summarized as follows:

> case law holds there is no constitutional impediment to the indefinite detention of an alien with a criminal record under a final order of exclusion, deportation, or removal if (1) there is a possibility of his eventual departure; (2) there are adequate and reasonable provisions for the grant of parole; and (3) detention is necessary to prevent a risk of flight or a threat to the community.

*Id.* at 397. The court went on to note that it is "unrealistic" to assert that inadmissible aliens being detained by the INS are "not actually being 'punished' in some sense for their past conduct," but explained that the power of Congress and the Executive to detain inadmissible aliens is well-established. *See id.* at 398. The Third Circuit held that the lengthy detention of inadmissible aliens with criminal records, where the INS cannot control the removal, does not violate due process where "appropriate provisions" for parole are available. *See id.* "So long as petitioner will receive searching periodic reviews, the prospect of indefinite detention without hope for parole will be eliminated." *Id.* at 399.[5] The court concluded that the

---

5. While the Third Circuit appears to base these rights in the Fifth Amendment, the procedural requirements appear to conflict with the well-settled maxim that " 'Whatever the

procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.' " *See Mezei,* 345 U.S. at 212, 73 S.Ct. 625 (quoting *United States ex rel. Knauff*

Interim Procedures [6] then-proposed by the INS for parole review of all inadmissible aliens other than Mariel Cubans provided, on their face, for the required searching periodic review. *Id.* at 399.

### III. JURISDICTION

At the time that he filed this Petition, Petitioner was in custody at Fairton Federal Correctional Institution in Fairton, New Jersey. Thus, this Court has jurisdiction to entertain this Petition. *See* 28 U.S.C. § 2241(d) (1994). At oral argument, the parties represented that Petitioner was transferred to a federal correctional institute in Colorado for a drug rehabilitation program. This has no effect on this Court's jurisdiction. *See Ex parte Catanzaro,* 138 F.2d 100, 101 (3d Cir. 1943).

### IV. A SEARCHING, PERIODIC PAROLE DETERMINATION

■ The Third Circuit listed seven provisions of what is now 8 C.F.R. § 241.4 that, if "conscientiously applied," would appear to satisfy due process. *See Ngo,* 192 F.3d at 399. Those factors are:

(1) written notice to the alien thirty days prior to the custody review advising that he may present information supporting a release; (2) the right to representation by counsel or other individuals; (3) the opportunity for an annu-

al personal interview; (4) written explanations for a custody decision; (5) the opportunity for review by INS headquarters; (6) reviews every six months; [and] (7) a refusal to presume continued detention based on criminal history....

*Id.* The Third Circuit also noted other provisions, *id.,* but those appear to be details relating to these seven major provisions.

The Cuban Review Plan [7] does not provide an alien with a right to receive notice of an interview, as 8 C.F.R. § 241.4 provides. *Compare* 8 C.F.R. § 212.12(b)(1), *and* 8 C.F.R. § 212.12(d)(4)(ii), *with* 8 C.F.R. § 241.4(h)(2). While the Cuban Review Plan does provide that an alien may provide the Cuban Review Panel with any information, either orally or in writing, that "he believes presents a basis for release on parole" and that an alien "may be accompanied during the interview by a person of his choice," *id.* at § 212.12(d)(4)(ii), those rights do not benefit a Mariel Cuban if he does not have notice so as to gather the information or contact the person.

Eight C.F.R. § 241.4(k)(2)(iv) provides an alien with the opportunity for an annual personal interview, and 8 C.F.R. § 241.4(h)(4) provides the right to receive a written explanation for a custody deci-

---

*v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950)). The Third Circuit, however, appears to have set forth a bare minimum for the process that Congress and the INS must provide. This Court can discern two plausible rationales for this apparent conflict. The court may have found that inadmissible aliens have a substantive right to be free from arbitrary detention, and that, to demonstrate the lack of arbitrariness, a minimal procedure must be established. Alternatively, the court may have given some credence to the punishment rationale offered by the Tenth Circuit in *Rodriguez–Fernandez.* The Sixth Circuit decision in *Rosales–Garcia*

was issued after *Ngo.* While the Third Circuit's reasoning may not be clear, this Court's obligation to follow the law as defined by the Third Circuit is.

**6.** The Interim Procedures have since been slightly modified and codified. *See,* Continued Detention of Inadmissible, Criminal, and Other Aliens Beyond the Removal Period, 8 C.F.R. § 241.4 (2001).

**7.** *See* Parole Determinations and Revocations Respecting Mariel Cubans, 8 C.F.R. § 212.12 (2001).

sion. The Cuban Review Plan provides that the Cuban Review Panel "shall personally interview" a Mariel Cuban who it or the Director of the Cuban Review Plan does not recommend for parole after an initial review of the record. *Id.* at § 212.12(d)(4)(i)-(ii). Under the Cuban Review Plan, the Panel must review an alien's record annually, so, like 8 C.F.R. § 241.4, the Cuban Review Plan provides for an *annual personal interview.* The Cuban Review Plan, however, does not provide a Mariel Cuban with the right to a written explanation for a custody decision.

A final distinction between the two parole schemes is the sponsorship requirement. A Mariel Cuban may not be released from custody, even after a determination that he is releasable, until the INS finds an appropriate sponsor. *See* 8 C.F.R. § 241.4(j)(2).

This court finds that the Cuban Review Plan provides Mariel Cubans with a process sufficient to satisfy their due process rights as defined by the Third Circuit in *Ngo.* Annually, either the Director of the Cuban Review Plan or the Cuban Review Panel must review a Mariel Cuban's file and make a determination whether the alien be granted parole. The criteria and factors are clearly defined:

> (2) Criteria for Review. Before making any recommendation that a detainee be granted parole, a majority of the Cuban Review Panel members, or the Director in case of a record review, must conclude that:
>
> (i) The detainee is *presently a nonviolent person;*
>
> (ii) The detainee is *likely to remain nonviolent;*
>
> (iii) The detainee is not likely to pose a threat to the community *following his release;* and
>
> (iv) The detainee is not likely to violate the conditions of his parole.

(3) Factors for consideration. The following factors should be weighed in considering whether to recommend further detention or release on parole of a detainee:

> (i) The nature and number of disciplinary infractions or incident reports received while in custody;
>
> (ii) The detainee's past history or criminal behavior;
>
> (iii) Any psychiatric and psychological reports pertaining to the detainee's mental health;
>
> (iv) Institutional progress relating to participation in work, educational and vocational programs;
>
> (v) His ties to the United States, such as the number of close relatives residing lawfully here;
>
> (vi) The likelihood that he may abscond, such as from any sponsorship program; and
>
> (vii) Any other information which is probative of whether detainee is likely to adjust to life in a community, is likely to engage in future acts of violence, is likely to engage in future criminal activity, or is likely to violate the conditions of his parole.

*Id.* at § 212.12(d) (emphasis added).

Unlike the review provided to the petitioner in *Ngo* prior to the INS' adoption of the Interim Procedures, the Cuban Review Panel does not base its decision solely on a petitioner's criminal history. The Panel considers many factors to determine whether a Mariel Cuban is presently non-violent and is likely to be non-violent in the future. The Cuban Review Plan provides Mariel Cubans with a "searching periodic review[ ]." *See Ngo,* 192 F.3d at 399.

■ This case also fails to present a situation where a petitioner's review was not, in fact, individualized. The Cuban

Review Panel interviewed Petitioner repeatedly on an annual basis. During the last interview, the Panel found that Petitioner accepted responsibility for his previous actions, whereas he previously failed to do so. The Panel ordered a mental health evaluation that found Petitioner needed treatment for substance abuse and sponsorship in a halfway house program. The Panel provided a searching review and did not merely "parrot the previous refusals." *See id.* at 393.

## V. *EQUAL PROTECTION UNDER THE FIFTH AMENDMENT*

### A. *Whether A Right Exists*

■ Still, as this Court explained in its Order of December 8, 2000, the possibility of an equal protection problem appears. All inadmissible aliens, with the exception of Mariel Cubans, receive the same parole procedures. It is clear that Mariel Cubans receive fewer procedural protections in their parole reviews. It is not clear, however, whether inadmissible aliens are entitled to equal protection of the laws under the Fifth Amendment. This Court finds that it need not decide whether Petitioner is entitled to equal protection, because the regulations at issue here would survive the scrutiny of this Court even if Petitioner had such a right.

■ The Due Process Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964) (quoting *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)); *see also*

*U.S. v. Weingartner,* 485 F.Supp. 1167, 1171 (D.N.J.1979).

As explained above, the dicta from the Supreme Court's decision in *Mezei* has generally been interpreted as giving an inadmissible alien no protection from detention under the Fifth Amendment. While inadmissible aliens have only the due process rights provided by Congress, the Third Circuit has interpreted *Mezei* and the case law of the other circuits since *Mezei* as providing an inadmissible alien with a due process right to a searching periodic parole review. That right appears to stem from the Fifth Amendment. Still, it is not clear whether that right includes a right to equal protection or whether a periodic parole review can be searching if a detainee's country of origin is a factor considered.

It may be, as Judge Arterton recently explained, that the "narrow and limited nature of substantive due process rights held by aliens" is a limit "on the circumstances in which such a right exists, not a shading on the extent or scope of that right once it is found to exist." *See Cardoso v. Reno,* 127 F.Supp.2d 106, 110 (D.Conn.2001). The right defined by the Third Circuit, however, is only to a searching periodic parole review and was not unequivocally extended to include all components of the Fifth Amendment.

The Eleventh and Tenth Circuits have addressed the issue of whether inadmissible aliens have a Fifth Amendment right to equal protection, with differing results. Neither circuit's decision has resulted in a rule of law because the United States Supreme Court effectively vacated that portion of the Eleventh Circuit's decision, and the Tenth Circuit's analysis appears in dicta.

In *Jean v. Nelson,* the Eleventh Circuit held that inadmissible Haitian aliens have no constitutional rights to or during a pa-

role decision by the INS, so there is no right to equal protection. 727 F.2d 957, 967–72 (11th Cir.1984) (en banc), *affirmed on other grounds* 472 U.S. 846, 848, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Thus, the INS was within its authority to deny parole to these aliens based on their nationality. *Id.* at 972.

The United States Supreme Court granted certiorari. *Jean v. Nelson,* 469 U.S. 1071, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984). While the Court affirmed the Eleventh Circuit's remand to the district court, it expressed no opinion on the issue of whether inadmissible aliens have a right to equal protection in their parole decisions and concluded that the Eleventh Circuit "should not have reached and decided the parole question on constitutional grounds." *Jean v. Nelson,* 472 U.S. 846, 848, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). The regulations at issue had been altered, while the case was on appeal to the Eleventh Circuit, eliminating the consideration of national origin from parole decisions for inadmissible aliens. *Id.* at 850–51, 105 S.Ct. 2992.

Justice Marshall, joined by Justice Brennan, dissented from the affirmation of the Eleventh Circuit's remand. He argued that the issue of whether inadmissible aliens are entitled to equal protection should have been reached and that the Court should hold that inadmissible aliens do have equal protection rights in their parole decisions. *Id.* at 858–82, 105 S.Ct. 2992 (Marshall, J., dissenting). Justice Marshall agreed that "*Mezei* might suggest" that inadmissible aliens cannot invoke equal protection rights under the Fifth Amendment. *See id.* at 868–69, 105 S.Ct. 2992. "This broad dicta, however, can withstand neither the weight of logic nor that of principle, and has never been incorporated into the fabric of our consti-

tutional jurisprudence." *Id.* at 869, 105 S.Ct. 2992.

In general, national-origin classifications have a stronger claim to constitutionality when they are employed in connection with decisions that lie at the heart of immigration policy. When central immigration concerns are not at stake, however, the Executive must recognize the individuality of the alien, just as it must recognize the individuality of all other persons within our borders. If in this case the Government acted out of a belief that Haitians (or Negroes for that matter) are more likely than others to commit crimes or be disruptive of the community into which they are paroled, its detention policy certainly would not pass constitutional muster.

*Id.* at 881, 105 S.Ct. 2992.

As explained above, the Tenth Circuit, in dicta, found that inadmissible aliens have a right to the protections of the Fifth Amendment. *See Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1386–89 (10th Cir.1981). The court specifically found that this included the right to equal protection of the laws. *Id.* at 1387. Still, as the Tenth Circuit recently confirmed in *Ho v. Greene,* 204 F.3d 1045, 1057 (10th Cir. 2000), the *Rodriguez–Fernandez* discussion of the issue was dicta, because the case was resolved on statutory grounds without a need to decide the case on constitutional grounds.

### B. A Prima Facie Case

█ If this Court were to find that Petitioner has a Fifth Amendment right to equal protection, it appears that he would be able to establish a prima facie case of discrimination in violation of that right. To establish an equal protection violation, Petitioner must establish that an "allegedly offensive categorization invidiously discriminates against the disfavored group." *Price v. Cohen,* 715 F.2d 87, 91–92 (3d

Cir.1983); *Pollock v. Ocean City*, 968 F.Supp. 187, 191 (D.N.J.1997).

Once the INS determines that an inadmissible alien is releasable,

> [t]he district director or Executive Associate Commissioner may, *in the exercise of discretion*, condition release on placement with a close relative who agrees to act as a sponsor, such as a parent, spouse, child, or sibling who is a lawful permanent resident or a citizen of the United States, or *may condition release* on the alien's placement or participation in an approved halfway house, mental health project, or community project when, in the opinion of the Service, such condition is warranted. No detainee may be released until sponsorship, housing, or other placement has been found for the detainee, *if ordered,* including but not limited to, evidence of financial support.

8 C.F.R. § 241.4(j)(2) (emphasis added).

That provision, however, does not apply to Mariel Cubans. *See* 8 C.F.R. § 241.4(b)(2). A Mariel Cuban may not: be released on parole until suitable sponsorship or placement has been found for the detainee. The paroled detainee must abide by the parole conditions specified by the Service in relation to his sponsorship or placement. The following sponsorships and placements are suitable:

(1) Placement by the Public Health Service in an approved halfway house or mental health project;

(2) Placement by the Community Relations Service in an approved halfway house or community project; and

(3) Placement with a close relative such as a parent, spouse, child, or sibling who is a lawful permanent resident or a citizen of the United States.

8 C.F.R. § 212.12(f).

Where all other inadmissible aliens may, at the discretion of the INS, be released without meeting sponsorship requirements, Mariel Cubans, by the language of the written regulations, must meet sponsorship requirements. Mariel Cubans cannot ask the INS to use its discretion to determine whether sponsorship is necessary. All other inadmissible aliens are entitled to the INS' use of that discretion.[8] Thus, Petitioner would be able to make a prima facie case of an equal protection violation if a Fifth Amendment right to equal protection exists.

### C. Standard of Review For An Equal Protection Challenge

■ Once a petitioner establishes a prima facie case of discrimination under the equal protection clause, the burden then shifts to the government to establish a justification for the classifications. The government's burden depends on the level

---

**8.** This court would not require Petitioner to show that the discretion would actually be exercised favorably. In *Francis v. INS*, 532 F.2d 268, 273 (2d Cir.1976), the court found a violation of equal protection in federal regulations distinguishing among groups of aliens. In that case, Francis, a lawful permanent resident, was found deportable because of a marijuana conviction. *Id.* at 269. Under INS regulations, he was not entitled to apply for a discretionary decision by the Attorney General that would permit him to remain in the United States despite that conviction. *Id.* at 270–71. Had he departed the United States, however, even "for a few hours to attend a funeral" following his conviction, and attempted to reenter, as an inadmissible alien he would have been entitled to a discretionary decision to permit him to remain in the United States. *Id.* at 273. The Second Circuit found a violation of Fifth Amendment equal protection. *Id.* at 272–73. The Court did not address the issue of whether Petitioner must demonstrate that the discretion would be exercised favorably, and this Court finds no reason to require Petitioner to demonstrate a favorable exercise would be forthcoming.

of scrutiny a court applies when examining the government's justification. This Court finds that a rational basis test would be applied.

■ In *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Supreme Court addressed "whether the statutory discrimination [w]ithin the class of aliens allowing benefits to some aliens but not to others is permissible." In *Mathews*, aliens challenged, on equal protection grounds, their ineligibility for Social Security benefits under federal law. *See id.* at 72–73, 96 S.Ct. 1883. The Court explained:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that would preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Id.* at 81–82, 96 S.Ct. 1883 (footnotes omitted).

All discovered cases have interpreted *Mathews* to mean that where a federal law discriminates among differing groups of aliens in admissions decisions, there is no equal protection violation as long as there is some facially legitimate reason for making the distinction. This is true even where the federal law discriminates based on nationality. *See, e.g., Nademi v. INS,* 679 F.2d 811, 814–15 (10th Cir.1982).

Still, some courts have reasoned that there is a distinction between the deference that a federal court should give to the legislative and executive branches in decisions regarding admission of aliens as opposed to the deference that a court should give to decisions regarding parole of inadmissible aliens who have no realistic chance of affecting entry into another country. In *Rodriguez–Fernandez,* the Tenth Circuit used this reasoning when it determined, in dicta, that no constitutional rights existed for exclusion proceedings, but they did exist for parole proceedings; detention after an exclusion proceeding was more akin to punishment. 654 F.2d at 1386–89; *see also Rosales–Garcia v. Holland,* 238 F.3d 704, 726 (6th Cir.2001) ("[A Mariel Cuban]'s prolonged detention can no longer be considered an ancillary administrative element of the INS's removal procedures and judicial deference loses its rationale altogether."); *Phan v. Reno,* 56 F.Supp.2d 1149, 1155 (W.D.Wash.1999) ("[T]he plenary power doctrine has far less force [in detention decisions] than it does, for example, over decisions concerning who should or should not be admitted, or who should or should not be deported."). *But see Jean v. Nelson,* 727 F.2d 957, 970 (11th Cir.1984) (rejecting this distinction). The courts that have made this distinction have not applied a heightened scrutiny specifically to an equal protection challenge, but to a more general substantive due process challenge.

■ This Court finds that a rational basis test should be used by a federal court when examining distinctions among groups of aliens by the INS in parole decisions. To apply a heightened scrutiny

in this situation would create an anomaly where the executive and legislative branches may have strong political reasons, implicating relations with foreign powers, for disallowing the entry of aliens from a particular country, but those reasons would eventually become subject to heightened judicial scrutiny, in violation of the Supreme Court's mandate in *Mathews*, because the alien is being detained by the United States and the particular country will not take the alien back. The Supreme Court warned that scrutiny of distinctions between groups of aliens beyond the use of a rational basis test "should be adopted only with the greatest caution." Thus, this Court would use the rational basis test to determine whether Petitioner's Fifth Amendment right to equal protection is violated by the INS under the parole procedures for Mariel Cubans, if Petitioner had such a right.

 As long as there is a facially legitimate reason for the distinctions between aliens in an immigration law, the law complies with the equal protection component of the Due Process Clause of the Fifth Amendment. *Fiallo v. Bell*, 430 U.S. 787, 797, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *DeSousa v. Reno*, 190 F.3d 175, 184–85 (3d Cir.1999). "[S]uch a classification can be upheld as constitutional even when it is based on rational speculation.... Once a facially legitimate reason for the classification is found, whether such a reason was articulated by Congress or not, [a court] must rule the classification constitutional." *DeSousa*, 190 F.3d at 184 (citing *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)); *see also Pinho v. INS*, 249 F.3d 183, 189 (3d Cir.2001) (applying rational basis test to differing rights of aliens based on nationality).

If a right to equal protection exists under the Fifth Amendment, that right would not be violated by the differences in the sponsorship requirements between Mariel Cubans and all other inadmissible aliens. As described above, a great public alarm sounded with the influx of the Mariel Cubans. The government was concerned about Castro opening the doors to prisons and sending his violent criminals to the United States.

That concern, it turns out, was most likely not rational. All but approximately 2,000 Mariel Cubans have been released from detention. Mastin, *supra*, at 151. Petitioner argues that the government no longer has any rational basis for believing that the Mariel Cubans are more in need of sponsorship requirements than any other category of inadmissible aliens. But, given that a small percentage of the Mariel Cubans were in fact released from Cuban prisons for transport to the United States, and given that only a small percentage of the Mariel Cubans currently remain in detention in the United States, the government could have a rational belief that those Mariel Cubans still in detention are clearly in need of sponsorship if released on parole, whereas other inadmissible aliens may or may not need sponsorship.

Because there exists a rational reason on which the government could have relied in establishing different treatment for these two categories of inadmissible aliens, this Court would have to find in favor of the government. Because the categorization would survive judicial scrutiny, this Court finds that it should not address the novel constitutional issue of whether Petitioner has any right to equal protection under the Fifth Amendment.

## VI. CONCLUSION

Petitioner, an inadmissible alien who has been physically present in the United States for over twenty years, is still to be treated by this Court as not having entered the United States. As such, he is

not entitled to the same constitutional protections afforded to aliens who have affected entry into this country, either legally or illegally. Whatever the United States Supreme Court may eventually define the limited constitutional rights of Petitioner to be, as of today, in the Third Circuit, Petitioner has only a right to a searching periodic parole review. The INS is currently providing Petitioner with that review.

Petitioner may or may not have a right to equal protection of the laws of this country under the Fifth Amendment. While he can establish that the treatment he receives would be different if he did not fall within the category of Mariel Cubans, this Court finds that the different treatment is based on a rational decision by the legislative and executive branches of the United States. Thus, this Court need not determine the highly controversial issue of whether Petitioner's equal protection rights exist at all.

An appropriate order will issue.

## ORDER

For the reason contained in this Court's Opinion of even date,

IT IS HEREBY ORDERED on this 18th day of May, 2001 that Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 is *DENIED;* and

IT IS FURTHER ORDERED that this matter is *DISMISSED WITH PREJUDICE.*