

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-19-2001

# Patel v. Zemski

Precedential or Non-Precedential:

Docket 01-2398

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Patel v. Zemski" (2001). *2001 Decisions.* Paper 293.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/293

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 19, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2398

VINODBHAI BHOLIDAS PATEL,
        Appellant

v.

CHARLES ZEMSKI, DISTRICT DIRECTOR, PHILADELPHIA
DISTRICT, IMMIGRATION AND NATURALIZATION
SERVICE, MARY ANN WYRSCH, ACTING
COMMISSIONER, IMMIGRATION AND NATURALIZATION;
UNITED STATES ATTORNEY GENERAL

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 01-cv-00405)
District Judge: Hon. Ronald L. Buckwalter

Argued September 20, 2001

Before: SLOVITER, NYGAARD and McKEE, Circuit  Judges

(Filed: December 19, 2001)

        Michelle S. Walker
        Philip J. Katauskas
        Pepper Hamilton LLP
        Philadelphia, PA 19103

        Judy Rabinovitz (Argued)
        American Civil Liberties Union
        Immigrants' Rights Project
        New York, N.Y. 10004-2400

Liliana M. Garces
ACLU Immigrants' Rights Project
Oakland, CA 94612

Robert D. Kolken
Eric W. Schultz
Sacks & Kolken
Buffalo, N.Y. 14202-2993

 Attorneys for Appellant

Michael L. Levy
United States Attorney
James G. Sheehan
Assistant United States Attorney
 Chief, Civil Division
Stephen J. Britt (Argued)
Assistant United States Attorney
Office of United States Attorney
Philadelphia, PA 19106

 Attorney for Appellee

Jennifer Rochon
Kramer, Levin, Naftalis & Frankel
New York, N.Y. 10022

 Attorney for Amicus-Appellant
The American Immigration
 Lawyers Association
Citizens and Immigrants for
 Equal Justice

OPINION OF THE COURT

SLOVITER, Circuit Judge.

The issue before us is a limited one. The appellant does not challenge the power of the Immigration and Naturalization Service ("INS") to detain him. Indeed, appellant, a lawful permanent resident, concedes that the INS has legitimate grounds for detaining some individuals pending removal. The only issue is whether appellant, and aliens in his position, can be mandatorily detained pending

a final determination on removal without any opportunity for an individualized determination of the alien's risk of flight or danger to the community. Ironically, such a determination is provided for lawful permanent residents charged as alien terrorists, an accusation that has never been leveled against appellant.

I.

INTRODUCTION

Appellant Vinodbhai Bholidas Patel filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania in which he challenged the constitutionality of his detention during the pendency of his deportation proceedings, detention mandated by the Immigration and Nationality Act ("INA") S 236(c), 8 U.S.C. S 1226(c) (2001). 1 The petition is directed to Charles W. Zemski, District Director for the Philadelphia District of the Immigration and Naturalization Service, Mary Ann Wyrsch, Acting Commissioner for the Immigration and Naturalization Service, and John Ashcroft, United States Attorney General, and claims that S 236(c) violates the alien's substantive and procedural due process rights under the Fifth Amendment of the Constitution. The District Court denied the petition and Patel appeals. Citizens and Immigrants for Equal Justice and the American Immigration Lawyers Association ("Amici") filed an amicus brief in support of Appellant.

This court has jurisdiction under 28 U.S.C. S 1291 since Patel seeks review of the District Court's final order in a habeas corpus proceeding under 28 U.S.C. S 2241. Section 236(e), which restricts judicial review of INS decisions made under this section, does not restrict judicial review of its constitutionality. Parra v. Perryman, 172 F.3d 954, 957 (7th Cir. 1999) (concluding that the restriction in S 236(e) "deals with challenges to operational decisions, rather than to the legislation establishing the framework for those decisions.").

_____

1. To avoid confusion we will, when possible, use the statutory section number, i.e. S 236(c), rather than the codified section, 8 U.S.C. S 1226(c).

3

We review de novo the District Court's legal conclusions regarding the constitutionality of the statute at issue. Abdul-Akbar v. McKelvie, 239 F.3d 307, 311 (3d Cir. 2001); DeSousa v. Reno, 190 F.3d 175, 180 (3d Cir. 1999).

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.

Patel is a 55-year old native and citizen of India. He has lived in the United States since 1984 and has been a lawful permanent resident since 1990. Prior to his detention, Patel resided in St. Louis, Missouri where he has several business interests, including Dunkin' Donuts franchises, bagel shops, and hotels. Patel's wife and four children reside in the United States, along with several members of his extended family. In 1996, the INS approved Patel's application for naturalization. Prior to scheduling the administration of the oath of allegiance, the INS revoked its approval of Patel's naturalization request because of Patel's conviction of the crime that serves as the basis for his current removal proceedings.

On January 10, 2000, Patel was convicted upon a plea of guilty in the United States District Court for the Eastern District of Missouri of the offense of harboring an undocumented alien in violation of INA S 274(a)(1)(A)(iii), 8 U.S.C. S 1324(a)(1)(A)(iii) (2001). Patel's conviction was based on his employment of the alien, and apparently his provision of a place for the alien to live. The undocumented alien had entered the United States several years prior to his employment by Patel. Patel had no involvement with the alien's entry into the country. The court sentenced Patel to five months of home probation and five months in prison at the Allenwood Federal Prison in Pennsylvania. App. at 4, 14.2

_____

2. Although the judgment of sentence does not include any reference to five months home probation, appellant recounted the sentence as such, both in his brief and in oral argument (without contradiction by the government) and the government's Response to the Petition for Writ of Habeas Corpus in the District Court is in agreement. At argument, the government stated that it believed the home probation followed the prison sentence but there is some ambiguity in the record.

Although persons who are confined to a penal institution for 180 days or more cannot establish good moral character, a prerequisite to naturalization, INAS 101(f)(7), 8 U.S.C. S 1101(f)(7), Patel has not lost his eligibility for naturalization because his jail sentence was less than 180 days.

B.

On September 18, 2000, while Patel was serving his sentence, the INS issued a Notice to Appear directed to Patel charging that his conviction constituted an "aggravated felony" within the meaning of INA S 101(a)(43)(N), 8 U.S.C. S 1101(a)(43)(N) (2001) and rendered him subject to removal under INA S 237(a)(2)(A)(iii), 8 U.S.C. S 1227(a)(2)(A)(iii) (2001). After Patel completed serving his sentence in January 2001, the INS took him into custody and placed him in detention in the Snyder County Prison in Selinsgrove, Pennsylvania. He remains there to the present day.

On January 3, 2001, Patel exercised his right to request a bond hearing before an immigration judge ("IJ") to re-evaluate his custody status. The hearing was held on January 11, 2001. However, the statute provides that if the IJ finds that S 236(c) is applicable, the IJ is precluded from considering any factors for release. Thus, Patel was heard only on his argument that the crime of which he was convicted, harboring an alien, does not "relate to alien smuggling" and does not constitute an aggravated felony mandating detention under S 236(c). On January 12, 2000, the presiding IJ rejected Patel's argument. In so holding, the IJ followed the precedent of the Board of Immigration Appeals ("BIA") that a conviction for harboring aliens constitutes an aggravated felony. App. at 29-31. Consequently, the IJ found Patel subject to mandatory detention under S 236(c), precluding an individualized determination into the necessity of detention. App. at 29-31. Patel appealed this decision to the BIA and on May 15, 2001, the BIA affirmed the decision upholding mandatory detention. App. at 32-33.

On April 3, 2001, after a hearing on the merits of

removal, an IJ in York, Pennsylvania issued an oral decision ordering Patel removed from the United States. App. at 34. Patel timely filed a Notice of Appeal of this decision with the BIA and the order of removal has been stayed.3

Patel filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania contesting his detention under S 236(c). Patel v. Zemski, No. CIV. A. 01-405, 2001 WL 503431 (E.D. Pa. May 11, 2001). The District Court denied Patel's petition and Patel timely appealed.

III.

DISCUSSION

A.

The current immigration laws reflect part of a growing effort by Congress to expedite the removal of criminal aliens. See S. Rep. No. 104-249, at 2 (1996) (describing goal of "expediting the removal of excludable and deportable aliens, especially criminal aliens"). Prior to 1988, all individuals subject to deportation were entitled to a bond hearing. See Matter of Patel, 15 I. & N. Dec. 666 (BIA 1976) (discussing the law as it existed at that time, INAS 242(a), 8 U.S.C. S 1252(a) (1977)). Since that time, Congress has drafted several amendments to the immigration laws, gradually limiting the availability of discretionary relief for aggravated felons subject to deportation and increasing the categories of aggravated felonies,4 culminating in the

_____

3. Ordinarily, once there has been an order of removal, the section applicable would be INA S 241(a)(6), 8 U.S.C.S 1231(a)(6) (2001), which governs post-final-order detention. The parties were uncertain whether the stay affected which provision applied, S 236(c) or S 241(a)(6). Because
Patel remains in detention without any individualized review, we consider this case under S 236(c) as it was originally presented.

4. In 1988, Congress passed the Anti-Drug Abuse Act of 1988, Pub. L. 100-690, S 7343(a), 102 Stat. 4181 (1998), which amended former INA

6

passage on September 30, 1996 of the Illegal Immigration
Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),
Pub. L. No. 104-208, 110 Stat. 3009-546 (1996). Section
236(c), codified at 8 U.S.C. S 1226(c), was added to the INA
by the 1996 amendments, the Anti-Terrorism and Effective
Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132,
110 Stat. 1214 (1996), and IIRIRA. It provides:

>    (c) Detention of criminal aliens

>    (1) Custody

>    The Attorney General shall take into custody any
>    alien who--

>    (A) is inadmissible by reason of having commit ted
>    any offense covered in section 1182(a)(2) [moral
>    turpitude and controlled substance-related offenses
>    with maximum penalties of at least one year] of this
>    title,

>    (B) is deportable by reason of having committe d
>    any offense covered in section 1227(a)(2)(A)(ii)
>    [multiple criminal convictions for crimes of moral
>    turpitude], (A)(iii) [aggravated felonies], (B) [controlled

_____

S 242(a)(2) (formerly codified at 8 U.S.C.S 1252(a)(2) (1989)), to provide
"[t]he Attorney General shall take into custody any alien convicted of an
aggravated felony upon completion of the alien's sentence for such
conviction. Notwithstanding subsection (a), the Attorney General shall
not release such felon from custody."

In 1990, Congress amended INA S 242(a)(2) (formerly codified at 8
U.S.C. S 1252(a) (1991)), by the Immigration Act of 1990, Pub. L. No.
101-649, S 504, 104 Stat. 4978 (1990), to permit release of lawful
permanent residents who demonstrated that they were not a threat to
the community or posed a risk of flight.

In 1991, former INA S 242(a)(2) was further amended by the
Miscellaneous Technical Immigration and Naturalization Amendments of
1991, Pub. L. 102-232, S 306(a)(4), 105 Stat. 1751 (1991), to allow
release of "lawfully admitted alien[s] who had been convicted of an
aggravated felony" if the alien "demonstrates to the satisfaction of the
Attorney General that such alien is not a threat to the community and
that the alien is likely to appear before any scheduled hearings." Former
INA S 242(a)(2)(B) (formerly codified at 8 U.S.C. S 1252(a) (1992)).

substances], (C) [certain firearm offenses], or (D) [miscellaneous crimes] of this title,

   (C) is deportable under section 1227(a)(2)(A)(i) [moral turpitude] of this title on the basis of an offense for which the alien has been sentence [sic] to a term of imprisonment of at least 1 year, or

   (D) is inadmissible under section 1182(a)(3)(B ) [terrorist activities] of this title or deportable under section 1227(a)(4)(B) [terrorist activities] of this title,

   when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

INS S 236, 8 U.S.C. S 1226. The language applicable here is S 236(c)(1)(B), applying mandatory detention to aliens convicted of aggravated felonies.

The statute gives the Attorney General discretion to release an alien who falls under S 236(c) only if the alien's release is necessary to provide protection to, inter alia, a witness, a potential witness, or a person cooperating with a criminal investigation, and even then only if the alien will not pose a danger to the safety of others or flight risk. INA S 236(c)(2), 8 U.S.C. S 1226(c)(2). No discretion otherwise remains to consider whether criminal aliens, including those who were lawfully admitted to this country, pose any danger or flight risk during the pendency of the proceedings.

Each detained alien is entitled to request a bond hearing at which an IJ determines whether S 236(c) applies. If it does, the hearing ends, as the statute precludes the IJ from inquiring into grounds for release or ordering release. In the case of non-criminal aliens, i.e., all other aliens subject to removal, the Attorney General retains discretion to decide whether they should be detained, released on bond, or released on conditional parole. INA S 236(a)-(b), 8 U.S.C. S 1226(a)-(b).

Patel has been confined under mandatory detention without an individualized hearing under S 236(c)(1)(B), on the ground that the offense to which he pled guilty is an

8

aggravated felony. The term "aggravated felony" is defined in INA S 101(a)(43), 8 U.S.C. S 1101(a)(43), and includes, in subsection N,

> an offense described in paragraph (1)(A) or (2) of section 1324(a) of this title (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter.

INA S 101(a)(43)(N), 8 U.S.C. S 1101(a)(43)(N).

The referenced section, INA S 274(a), 8 U.S.C.S 1324(a) (2001), which serves as the basis for Patel's conviction, establishes criminal penalties for any person who brings in, transports, or harbors an alien. Patel argues that the words, "relating to alien smuggling" in INAS 101(a)(43)(N), were meant to be limiting, rather than descriptive, placing his conviction for alien harboring outside the reach of this statute. However, the IJ ruled against him on that issue in his bond redetermination hearing, citing to its earlier precedent in In re Ruiz-Romero, Interim Decision 3376, 1999 BIA LEXIS 2, at *7-9 (BIA 1999), where the BIA held that those words are merely descriptive. In Patel's case, the IJ relied on Ruiz-Romero when he held that the parenthetical phrase evidences "[c]ongressional intent to criminalize all activities which enable[ ] aliens to enter or remain in the United States." App. at 30. Patel appealed this issue to the BIA and continues to assert that he is not subject to S 236(c) because alien harboring is not the equivalent of alien smuggling. This court does not have jurisdiction to decide the merits of Patel's arguments against removal, though the fact that he continues to challenge his removal through authorized channels is relevant to his constitutional challenge.

B.

Patel claims that his detention without any opportunity for an individualized determination of his risk of flight or danger to the community violates both his substantive and

9

procedural due process rights to be free from restraint of liberty. Several district courts within this circuit have addressed this issue. The majority have found S 236(c) unconstitutional. See Sharma v. Ashcroft, 158 F. Supp. 2d 519 (E.D. Pa. 2001) (holding mandatory detention under S 236(c) violates petitioners' due process rights and ordering INS to conduct a bond hearing); Radoncic v. Zemski, 121 F. Supp. 2d 814 (E.D. Pa 2000) (same); Koita et al. v. Reno, 113 F. Supp. 2d 737 (M.D. Pa. 2000) (holding S 236(c) violates petitioners' substantive and procedural due process rights); Juarez-Vasquez v. Holmes, No. 00-CV-4727, 2000 U.S. Dist. LEXIS 16417 (E.D. Pa. Nov. 3, 2000) (holding S 236(c)'s absolute restriction upon petitioner's liberty interest violates due process and ordering petitioner released unless the INS conducts a bond hearing); Chukwuezi v. Reno, No. 3: CV-99-2020, 2000 U.S. Dist. LEXIS 15432 (M.D. Pa. May 16, 2000) (same); Bouayad v. Holmes, 74 F. Supp. 2d 471 (E.D. Pa. 1999) (same); but see Edwards v. Blackman, 48 F. Supp. 2d 477 (M.D. Pa. 1999) (relying on Seventh Circuit decision in Parra v. Perryman, 172 F.3d 954 (7th Cir. 1999), to find no due process violation), vacated as moot, No. 99-3674 (3d Cir. Jan. 11, 2000). And of course, in this case as well the District Court held the statute constitutional, following Parra .

In order to analyze the merits of Patel's claim, we must first establish the nature of the right asserted so that we can determine the standard of substantive due process scrutiny to be applied. Then we can assess the constitutionality of S 236(c) under that standard.5 Only if we find that S 236(c) does not violate Patel's substantive due process rights do we need to reach the question of procedural due process.

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292, 306 (1993). Although due process rights can be denied to aliens seeking admission to the United States, Landon v. Plasencia, 459 U.S. 21, 32 (1982), aliens who have entered the country are entitled to

---

5. Patel has framed his constitutional challenge as an as-applied challenge to the statute and we treat his challenge as such.

10

the protection of the Due Process Clause whether their presence in this country is lawful or not. See Zadvydas v. Davis, 121 S.Ct. 2491, 2501 (2001) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.") (quoting Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)); Landon, 459 U.S. at 32 ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly."). Thus Patel, a lawful permanent resident,[6] is entitled to due process protection against unlawful or arbitrary restraint, a legal proposition the government does not contest. Although the government accepts that legal proposition, it and Patel do not agree as to the appropriate level of substantive due process scrutiny.

Patel argues that the statute deprives him of a fundamental liberty interest, which requires this court to apply heightened due process scrutiny. Specifically, he argues that government detention without an individualized determination infringes on his fundamental right to liberty and violates substantive due process unless the detention is ordered in "certain special and `narrow' non-punitive `circumstances,' " Appellant's Br. at 11 (citing Zadvydas, 121 S.Ct. at 2499), and is not " `excessive in relation to' the purposes it is intended to serve." Appellant's Br. at 11 (citing United States v. Salerno, 481 U.S. 739, 747 (1987)).

The government argues that the liberty interest of a criminal alien is not a fundamental right, relying on the decision in Parra where the court stated that the alien's chance of success in the removal proceedings is so minimal as to verge on the nonexistent. 172 F.3d at 958. The government argues that the alien's interest is the right to be free of "arbitrary" detention which is "subject to only limited judicial review" because an alien is entitled to a lesser due process right than a citizen. Appellee's Br. at 6 (citing Doherty v. Thornburgh, 943 F.2d 204, 209 (2d Cir. 1991)).

_____

6. The BIA has recognized that an alien maintains his or her status as a lawful permanent resident pending a final order of removal. See In re Mendoza-Sandino, Interim Dec. 3426, 2000 BIA LEXIS 3 (BIA 2000).

It is undisputed that Congress has plenary power to create substantive immigration law to which the judicial branch generally must defer. See, e.g. , Harisiades v. Shaughnessy, 342 U.S. 580, 589-90 (1952). As the Supreme Court has stated, "in the exercise of its broad power over immigration and naturalization, `Congress regularly makes rules that would be unacceptable if applied to citizens.' " Fiallo v. Bell, 430 U.S. 787, 792 (1977) (quoting Matthews v. Diaz, 426 U.S. 67, 80 (1976)). However, Congress' power is subject to constitutional limitations, including due process constraints. Zadvydas, 121 S.Ct. at 2501.

The Supreme Court recently addressed this issue in Zadvydas and distinguished between the deference that must be afforded to immigration policies and the more searching review of the procedures used to implement those policies. 121 S.Ct. at 2501-502. The issue in the present case implicates the latter, the means by which Congress effects its determinations regarding who should be deported and on what basis, not the actual criteria for deportation. See INS v. Chadha, 462 U.S. 919, 940-41 (1983) ("The plenary authority of Congress over aliens . . . is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power."). This distinction was critical in Zadvydas where the Supreme Court reiterated Congress' right to remove and detain aliens but made clear that the Court did not infringe on Congress' plenary authority by addressing the constitutionality of the detention of aliens incapable of removal. 121 S.Ct. at 2501-02. We follow that path in examining whether S 236(c) infringes on a "fundamental" liberty interest. Flores, 507 U.S. 292, 302 (1993). If the statute infringes on a fundamental liberty interest, it must be narrowly tailored to serve a compelling state interest. Id. at 301-02. If not, there need only be a "reasonable fit" between the government's purpose and the means chosen to implement that purpose. Id. at 305.

Patel does not contend that his interest is an absolute right to freedom during the pendency of his proceedings. He recognizes, as we noted at the outset, that the government has the right to remove aliens and to detain them during

the pendency of their removal proceedings. Id. at 302; Carlson v. Landon, 342 U.S. 524, 543 (1952). Patel asserts that mandatory detention nevertheless implicates his fundamental right to be free from physical restraint. The government, which describes the alien's interest as a conditional one, notes that this right to be free from restraint may be restricted to ensure his appearance at proceedings or to protect the community. Patel responds that the possibility of such restriction does not mean that the liberty interest infringed upon is any less fundamental. See, e.g., Salerno, 481 U.S. 739, 750 (1987) (upholding pretrial detention under certain circumstances despite infringing on the "individual's strong interest in liberty").

Several Supreme Court decisions guide our determination that the right implicated is a fundamental liberty right. In Flores, the Supreme Court addressed the constitutionality of detaining juvenile aliens pending deportation hearings pursuant to a statute that only allowed release to parents, close relatives, or legal guardians. 507 U.S. at 303. The Court applied a rational basis standard after finding that during the pendency of deportation proceedings the juvenile aliens had no fundamental liberty interest to be released into the custody of a private custodian rather than a government child-care institution, when no parent or legal guardian was available. Id. The Court based its decision to apply a rational basis test on the fact that children, by definition, are always in the custody of someone, whether their parents or the government, and the detention occurred in child-care institutions, not "barred cells." Id. at 302.

In contrast, the present case deals with a 55-year old man who has been locked in a prison cell for some eleven months. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." Foucha v. Louisiana, 504 U.S. 71, 80 (1992) (finding that due process was violated by a Louisiana statute permitting continued confinement of insanity acquittee without an adequate hearing). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Salerno, 481 U.S. at 755. In Salerno, the

13

Supreme Court upheld the Bail Reform Act's authorization
of pretrial detention on the basis of future dangerousness
in criminal cases because several procedural safeguards
were in place to protect the detainee's "fundamental" and
"strong" interest in liberty: the circumstances under which
detention could be sought were limited to the most serious
of crimes, the arrestee was entitled to a prompt detention
hearing, the maximum length of detention was limited, and
detainees were housed apart from convicts. Id.  at 747-50.

Most recently, in Zadvydas the Supreme Court
recognized that immigration detention implicates a
fundamental liberty interest. The Court examined the
constitutionality of the detention of aliens who had received
a final order of deportation but remained in INS custody
pursuant to S 241(a)(6) because the government was unable
to effect their removal to another country. The Court
construed the statute to limit post-removal-order detention
to a period reasonably necessary to bring about the alien's
removal, generally no more than six months. Zadvydas,
121 S.Ct. at 2505. In reaching this decision, the Court
stated that a "statute permitting indefinite detention of an
alien would raise a serious constitutional problem." Id. at
2498. It continued, "[f]reedom from imprisonment--from
government custody, detention, or other forms of physical
restraint--lies at the heart of the liberty that[the Due
Process] Clause protects." Id. The Court further asserted
that "government detention violates that Clause unless the
detention is ordered in . . . certain special and narrow non-
punitive circumstances . . . where a special justification . . .
outweighs the individual's constitutionally protected
interest in avoiding physical restraint." Id.  at 2498-99
(internal quotations and citations omitted).

Although aliens detained under S 236(c) are held for the
finite period of time leading to the issuance of a final
removal order and do not face the possibility of the
unending detention that arises when the likelihood of
executing a removal order is remote, as it was in Zadvydas,
detention pending the issuance of a final order is often
lengthy. Patel has been detained for eleven months, six
months longer than his prison sentence for the underlying
offense, and five months longer than the six-month period

14

the Supreme Court held presumptively reasonable for post-order detainees. Thus, while the Zadvydas Court did not address the constitutionality of pre-removal-order detention, there is no reason why the distinction between the statutes would make the Court's reasoning inapplicable to this case.

This court has previously recognized the critical liberty interest implicated by immigration detention. In Chi Thon Ngo v. INS, 192 F.3d 390 (3d Cir. 1999), the alien had received a final order of exclusion but remained in United States detention for four years since his native country, Vietnam, would not accept him. In that case, as in this one, the power of the government to detain aliens was not challenged; rather, the case concerned the procedures necessary to effect that detention. Even though Ngo was an excludable alien, rather than a deportable alien, and excludable aliens traditionally have been afforded less constitutional protection than deportable aliens, see Mezei, 345 U.S. at 212, we stated that "[w]hen detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable." Ngo, 192 F.3d at 398. We recognized that "[m]easures must be taken to assess the risk of flight and danger to the community on a current basis," id., but noted the need to protect the alien's right to due process. We stated that the "stakes are high and we emphasize that grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for aliens." Id. The decision of the Supreme Court in Zadvydas in effect validated our approach.

Significant for our purposes here is our holding in Ngo that the "process due even to excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk of flight." Id. We found that the statute satisfied due process because it provided for "searching periodic reviews" of the basis for detention but granted the petitioner's writ of habeas corpus since he had not received the "rigorous review of his eligibility for parole that due process requires." Id. at 399. Inasmuch as we insisted on heightened standards for an

15

alien ordered removed from this country, it follows that no lesser standard should be applied to a lawful permanent resident who still has available avenues for relief from removal.

C.

Because we have concluded that S 236(c) implicates Patel's fundamental right to be free from physical restraint, we must apply heightened due process scrutiny to determine if the statute's infringement on that right is narrowly tailored to serve a compelling state interest. Flores, 507 U.S. at 301-02. As the Supreme Court held in Zadvydas, government detention violates substantive due process unless it is "ordered in . . . special and `narrow' non-punitive `circumstances' . . . where a special justification . . . outweighs the `individual's constitutionally protected interest in avoiding physical restraint.' " 121 S.Ct. at 2499 (citing Salerno, 481 U.S. at 746; Foucha, 504 U.S. at 80; Kansas v. Hendricks, 521 U.S. 346, 356 (1997)).

In Salerno, the Supreme Court subjected the Bail Reform Act's authorization of pretrial detention in criminal cases to a two-part due process inquiry. 481 U.S. at 746-47. The test asks first, if the restriction on liberty constitutes impermissible punishment or permissible regulation, and second, whether the statute is excessive in relation to Congress' regulatory goals. Id. Applying the first prong of the Salerno inquiry to S 236(c), we readily conclude that the statute constitutes permissible regulation. The power to deport necessarily encompasses the power to detain. Thus, the detention mandated in S 236(c) is regulatory and not punitive. See Carlson, 342 U.S. at 537-38 ("Deportation is not a criminal proceeding and has never been held to be punishment . . . . Detention is necessarily a part of this deportation procedure.").

In order to determine if the statute is excessive, the second prong of the inquiry, we must examine Congress' purposes for the statute. According to the Senate Report, Congress had found that (1) the number of aliens who commit crimes in this country has grown, (2) unacceptable delays hindered the INS' ability to detain and deport aliens,

16

and (3) criminal aliens posed a growing threat to public safety. S. Rep. No. 104-48, at 1-2 (1995). The statute was enacted with the goal of ensuring the immediate availability of criminal aliens for hearings and ultimately deportation, while protecting the public from the danger posed by criminal aliens. See, e.g., 142 Cong. Rec. 7349 (1996) (statement of Sen. Abraham) (mentioning mandatory detention as one of a system of reforms designed to expedite deportation of criminal aliens). Patel concedes that these goals present legitimate government objectives. The question before this court is whether mandatory detention absent any individualized inquiry is excessive in relation to these interests.

Due process requires an adequate and proportionate justification for detention--a justification that cannot be established without an individualized inquiry into the reasons for detention. Ngo, 192 F.3d at 398-99. In Ngo, the challenge was to the denial of parole to an alien whose country of origin would not repatriate him. We held that "[d]ue process is not satisfied . . . by rubber-stamp denials [of parole] based on temporally distant offenses. The process due even to excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk of flight." Id. at 398. We approved a system for evaluating detention that required the "searching [and] periodic" individualized review of the alien's eligibility for parole and that did not presume the need for continued detention based on criminal history. Id. at 399.

In Flores, where the Supreme Court applied the rational basis test, the Court found that test was satisfied because the "detained juvenile aliens [were given] the right to a hearing before an immigration judge" regarding their custody. 507 U.S. at 309. In Salerno, where the Court upheld pretrial detention, such detention could be ordered only after the government had proved "by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." 481 U.S. at 751. Even in Carlson, where the Court upheld the detention of aliens deportable based upon their membership in the Communist Party, the detention was the

17

result of a discretionary decision after an individualized determination that the individual posed a danger to the community. 342 U.S. at 538 (finding that "purpose to injure could not be imputed generally to all aliens subject to deportation" and thus required the exercise of discretion). In contrast to these statutes, S 236(c) has no provision for the kind of individualized hearing that was a predicate for detention in these cases.

The requirements of substantive due process are not met unless there is a close nexus between the government's goals and the deprivation of the interest in question. In the context of S 236(c), there is no basis for us to conclude that the goals articulated by the government are sufficient to justify detention without individualized hearings. Section 236(c) creates an irrebutable presumption that all aliens subject to removal under this statute present a flight risk or a danger to the community. The government's own statistics cast doubt on that presumption. The government cites a study, the conclusions of which Patel and the amici vigorously contest,7 finding that prior to the enactment of this statute ninety percent of criminal aliens not detained during proceedings fled. Appellee's Br. at 12 (citing Parra, 172 F.3d at 956). In fact, a report from the Senate Committee on Governmental Affairs placed the percentage of aliens who fail to surrender at twenty percent. S. Rep. No. 104-48, at 23 (1995) ("over 20 percent of non-detained criminal aliens do not appear for their deportation proceedings"). However, even if the ninety percent figure were correct, S 236(c) requires the imprisonment of the ten percent of aliens who would dutifully report to proceedings.

_____

7. The study relied upon in Parra concerned the failure of aliens to surrender for deportation after final orders of deportation had been issued. Immigration and Naturalization Service, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10323 (1997) (citing Office of the Inspector General, United States Dep't of Justice, Inspection Rep. No. I-96-03, Deportation of Aliens After Final Orders Have Been Issued 9 (1996) available at http://www.usdoj.gov/oig/i9603/i9603.htm). While the incentive for aliens facing possible deportation to abscond is presumably high, we have no empirical data to provide an actual percentage.

18

To deprive these individuals of their fundamental right to freedom furthers no government goal, while generating a considerable cost to the government, the alien, and the alien's family. The goals articulated by the government--to prevent aliens from absconding or endangering the community--only justify detention of those individuals who present such a risk.

Obviously, a hearing to evaluate flight risk and danger to the community presents a less restrictive means for the government to achieve its goals. It appears that such a procedure can be implemented with minimal burdens on the government. The government agreed at argument that shortly after an alien is placed in custody, the alien is entitled to a hearing before an immigration judge to determine if s/he is an "aggravated felon" subject to S 236(c). There appears to be no insurmountable reason why this hearing could not be expanded to incorporate an evaluation of flight risk and danger, an evaluation that immigration judges already undertake for non criminal aliens.[8] The requirement of an individualized hearing would infuse the detention process with the accuracy and precision that it currently lacks.

We do not downplay the risk that some criminal aliens might pose to the community or the risk that they might flee before a final order is issued. But an immigration judge would retain the discretion to detain any alien who poses such a risk.[9]

Patel's situation presents an illustration of the injustice

_____

8. The government argued that aliens would interpose delaying tactics that would complicate such hearings. However, control over the hearing and the ability to thwart such delays lies firmly in the hands of the immigration judge.

9. Patel directs our attention to an INS-contracted study by the Vera Institute finding high success rates in a pilot program allowing for the supervised release of individuals in removal proceeding, including criminal aliens. See Eileen Sullivan et al., Testing Community Supervision for the INS: An Evaluation of the Appearance Assistance Program (2000) (finding that the vast majority of criminal aliens participating in the program appeared at all required hearings) at http://www.vera.org./publication-pdf/aapfinal.pdf.

19

S 236(c) can present. The government has not suggested that Patel poses a flight risk or danger to the community. He is a lawful permanent resident who has resided in this country for the last seventeen years. He has significant business ties to his community, and his wife and four children reside in the United States. He was convicted of alien harboring, not a violent crime or a crime with attendant dangers such as drug use, and he was permitted to remain out of custody during his criminal trial. In fact, the sentencing judge divided Patel's sentence into five months of home probation and five months of imprisonment, further reflecting the absence of any risk of flight or danger. Despite these facts, under this statute Patel has been forced to spend the last eleven months in a prison in a town far from his family and business, with no opportunity to prove that his detention serves no government purpose.

D.

The government suggests that we follow the decision in Parra, the only court of appeals decision to directly address this issue.10 The District Court here relied exclusively on Parra in denying Patel's habeas petition. Patel v. Zemski, No. CIV. A. 01-405, 2001 WL 503431 at *2 (E.D. Pa. May

_____

10. The Eleventh Circuit, in Richardson v. Reno, 162 F.3d 1338 (11th Cir. 1998), vacated by 526 U.S. 1142, remanded to 180 F.3d 1311 (11th Cir. 1999), upheld the constitutionality of S 236(c) in an isolated footnote
amidst an examination of the constitutionality of the process surrounding bond requests for non-criminal aliens."Congress acts well within its plenary power in mandating detention of a criminal alien with an aggravated felony conviction facing removal proceedings [citing S236(c)] . . . This poses no constitutional issue . . . The Supreme Court has determined that bail need not be provided in all immigration cases." 163 F.3d at 1363 n. 119 (citing Carlson, 342 U.S. at 546 for the last proposition). On remand from the Supreme Court, Richardson challenged the constitutionality of S 236(c) but the court found the statute inapplicable to his case and declined to rule on the matter, noting only that the sole circuit to address the issue, the Seventh Circuit, upheld the constitutionality of the statute. Richardson, 180 F.3d at 1317 n.9. Thus, the discussion in Richardson does not provide any helpful analysis.

20

11, 2001). However, Parra was decided before Zadvydas, and thus the Seventh Circuit did not have the benefit of the Supreme Court's analysis of the constitutional concerns presented by mandatory detention of aliens.

Parra, a citizen of Mexico and lawful permanent resident of the United States, was convicted of aggravated sexual assault, a felony that rendered him subject to removal from the United States. During the pendency of his removal proceedings, Parra was placed into federal detention pursuant to S 236(c). 172 F.3d at 955-56. The Seventh Circuit held that persons subject to S 236(c)"have forfeited any legal entitlement to remain in the United States and have little hope of clemency." Id. at 958 (emphasis in original). The court reasoned that because the possibility of discretionary relief from deportation under the statute has been restricted, deportation is "inevitable," and thus the legal right of the alien to remain in the United States has ended. Id. The court further held that because the alien lacks the right to remain and possesses the ability to end his detention by returning to his native country, the interest implicated is not substantial. The court found, under a procedural due process calculus, that the government interest outweighed the alien's limited private interest and the minimal probability of error. Id.

We disagree with the holding in Parra. First, the Seventh Circuit attributed much of its decision to the deference owed to Congress' plenary power over the treatment of aliens. Id. at 958 ("Given the sweeping powers Congress possesses to prescribe the treatment of aliens . . . the constitutionality of [S 236(c)] is ordained.") (citation omitted). However, as noted above, the Supreme Court in Zadvydas made clear that Congress' authority over the means of implementing its policies is limited by the Constitution and need not be accorded deference. 121 S.Ct. at 2501.

Second, the court in Parra assumed that all persons subject to S 236(c) will ultimately be given a final order of deportation, and concluded from this assumption that those persons have no liberty interest in being free from detention pending that final order. The amici have presented us with examples of instances where final orders

21

of deportation did not follow but we agree with the government that based on the strict requirements for deportation of criminal aliens and the limited availability of discretionary relief, a final order of deportation is likely in the majority of cases.11 However, the merits of the alien's removal proceedings should not be conflated with the determination of whether the alien should be detained pending the outcome of these proceedings. Although the Parra court did reason from one to the other, our precedent is to the contrary. In Ngo, we declined to collapse the issues of removal and detention, evidencing that whether or not the alien will ultimately be removed does not speak to the due process that must be afforded to the alien prior to a final decision on removal. 192 F.3d at 398 (finding that due process necessitates individualized review of detention for aliens who had already been ordered removed from the United States).

In any event, Patel has a significantly more compelling case for an individualized hearing than the alien in Parra. Parra had been convicted of a violent sexual offense and conceded the unavailability of relief from removal. Patel, on the other hand, was convicted of a non-violent offense, retains the possibility of relief from deportation, and contests the classification of his offense as an aggravated felony, a challenge that could render removal improper. See supra p.9. Arguably, Parra is even inapplicable to aliens such as Patel who do not concede their deportability.12

_____

11. The possibility of relief from deportation is provided by statutory provisions for cancellation of removal, INA S 240A, 8 U.S.C. S 1229b, withholding of removal, INA S 241(b)(3), 8 U.S.C. S 1231(b)(3), asylum, INA S 208(a), 8 U.S.C. S 1158, voluntary departure, INA S 240B, 8 U.S.C. S 1229c, and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted Dec. 10, 1984, S. Treaty Doc., No. 100-20 (1988), as well as non-statutory options such as post-conviction relief or legitimate claims of citizenship.
Aliens who have committed aggravated felonies are not eligible for some of these forms of relief.

12. "[I]t is easy to imagine cases--for example, claims by persons detained under [S 236(c)] who say that they are citizens rather than aliens, who contend that they have not been convicted of one of the felonies that authorizes removal, or who are detained indefinitely

22

Nevertheless, we do not base our decision on such a narrow ground.

Instead, we hold that mandatory detention of aliens after they have been found subject to removal but who have not yet been ordered removed because they are pursuing their administrative remedies violates their due process rights unless they have been afforded the opportunity for an individualized hearing at which they can show that they do not pose a flight risk or danger to the community. 13

IV.

CONCLUSION

For the reasons set forth above, we will reverse the denial of Patel's petition for habeas corpus and remand with directions that Patel be released from custody unless the government makes a prompt individualized determination whether the continued detention of Patel is necessary to prevent risk of flight or danger to the community.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

because the nations of which they are citizens will not take them back--in which resort to the Great Writ may be appropriate." Parra, 172 F.3d at 957 (discussing the availability of the writ of habeas corpus under U.S. Const. art. I, S 9, cl. 2, but finding that Parra presents none of those
possibilities since he concedes that he is removable because of his criminal conviction and his home country would accept his return).

13. Patel also alleges that S 236(c) violates his procedural due process rights. Because we conclude that Patel's substantive due process rights have been violated, it is unnecessary to determine whether his procedural due process rights were also violated. Salerno, 481 U.S. at 746 ("When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner) (emphasis added) (citing Matthews v. Eldridge, 424 U.S. 319, 335 (1976)).

23